**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | |
| Plaintiff, | |
| and | No. 07-CV-95-LRR |
| JANET BOOT, BARBARA GRANT, CINDY MOFFETT, REMCEY JEUNENNE PEEPLES, MONIKA STARKE, LATESHA THOMAS and NICOLE ANN CINQUEMANO, | **ORDER** |
| Plaintiffs-Interveners, | |
| vs. | |
| CRST VAN EXPEDITED, INC., | |
| Defendant. | |

*TABLE OF CONTENTS*

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
     A.   *Administrative Proceedings* . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
          1.   *Ms. Starke files the Charge* . . . . . . . . . . . . . . . . . . . . . **3**
          2.   *The EEOC processes the Charge* . . . . . . . . . . . . . . . . **3**
          3.   *The EEOC's investigation* . . . . . . . . . . . . . . . . . . . . . **5**
     B.   *The EEOC's Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
     C.   *Scheduling* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**
     D.   *Other Allegedly Aggrieved Persons* . . . . . . . . . . . . . . . . . . . **9**
          1.   *Unnecessary confusion* . . . . . . . . . . . . . . . . . . . . . . . **9**
          2.   *Case management orders* . . . . . . . . . . . . . . . . . . . . . **11**
     E.   *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

**III.   STATUTORY FRAMEWORK** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
    **A.**    **Sexual Harassment is Sex Discrimination** . . . . . . . . . . . . . . . . . . **14**
    **B.**    **Differences Between "§ 706" & "§ 707"**
        **Lawsuits by the EEOC** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
        **1.**    **Lawsuits under § 706** . . . . . . . . . . . . . . . . . . . . . . . . **17**
        **2.**    **Lawsuits under § 707** . . . . . . . . . . . . . . . . . . . . . . . . **18**
        **3.**    **Summary of differences** . . . . . . . . . . . . . . . . . . . . . . . **23**
        **4.**    **Confusion in this case** . . . . . . . . . . . . . . . . . . . . . . . . **24**
    **C.**    **Sexual Harassment Pattern or Practice Cases are Special** . . . . . . . **26**
        **1.**    **The Teamsters model "breaks down"** . . . . . . . . . . . . . **26**
        **2.**    **The modified burden-shifting approach of Jenson II** . . . . . . **27**
        **3.**    **Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

**IV.   THE MERITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**
    **A.**    **Standard for Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . **33**
    **B.**    **Preliminary Evidentiary Rulings** . . . . . . . . . . . . . . . . . . . . . . . **34**
    **C.**    **Summary Judgment Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **35**
        **1.**    **CRST's business model** . . . . . . . . . . . . . . . . . . . . . . **35**
        **2.**    **Front-line personnel** . . . . . . . . . . . . . . . . . . . . . . . . . **36**
            **a.**    **Trainees** . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**
            **b.**    **Co-drivers** . . . . . . . . . . . . . . . . . . . . . . . . . . **36**
            **c.**    **Lead drivers** . . . . . . . . . . . . . . . . . . . . . . . . **37**
            **d.**    **Dispatchers** . . . . . . . . . . . . . . . . . . . . . . . . **37**
        **3.**    **Status of women at CRST** . . . . . . . . . . . . . . . . . . . . **37**
        **4.**    **CRST's policy against sexual harassment** . . . . . . . . . . . . **38**
        **5.**    **Multiple avenues for reporting sexual harassment** . . . . . . . **43**
        **6.**    **Response and discipline** . . . . . . . . . . . . . . . . . . . . . . **44**
        **7.**    **Incidence of sexual harassment among CRST's drivers** . . . . **47**
        **8.**    **CRST's responses to specific situations** . . . . . . . . . . . . . **48**
    **D.**    **Arguments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**
        **1.**    **Motion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**
        **2.**    **Resistance** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **53**
        **3.**    **Reply** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**
    **E.**    **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **57**

**V.   CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **67**

## *I.  INTRODUCTION*

The matter before the court is Defendant CRST Van Expedited, Inc.'s "Motion for Summary Judgment on EEOC's Pattern and Practice Claim" ("Motion") (docket no. 150).

## *II.  PROCEDURAL BACKGROUND*

### *A.  Administrative Proceedings*

### *1.     Ms. Starke files the Charge*

On December 1, 2005, Plaintiff-Intervener Monika Starke ("Ms. Starke") presented a Charge of Discrimination ("Charge") to Plaintiff Equal Employment Opportunity Commission ("the EEOC").  Ms. Starke alleged that her employer, Defendant CRST Van Expedited, Inc. ("CRST"), "discriminated against [her] on the basis of . . . sex . . . , in violation of Title VII of the Civil Rights Act of 1964, [42 U.S.C. § 2000e *et seq.*,] as amended" ("Title VII").   Def.'s App'x at 2998.   Ms. Starke alleged the following "particulars" in her Charge:

> I was hired by [CRST] on June 22, 2005 in the position of Truck Driver.  Since my employment began with [CRST,] I have been subjected to sexual harassment on two occasions by my Lead Trainers.  On July 7, 2005, Bob Smith, Lead Trainer[,] began to make sexual remarks to me whenever he gave me instructions. . . . .  On July 14, 2005, I contacted the dispatcher and was told that I could not get off the truck until the next day.  On July 18, 2005 through August 3, 2005, David Goodman, Lead Trainer, forced me to have unwanted sex with him on several occasions while we were traveling in order to get a passing grade.

*Id.*  Further, Ms. Starke alleged that CRST "did not state why I was subjected to sexual harassment[,] which created a hostile work environment."  *Id.*

### *2.     The EEOC processes the Charge*

Ms. Starke asked the EEOC to file her Charge and cross-file it with the Iowa Civil Rights Commission ("ICRC").  Pursuant to a work-sharing agreement, the EEOC formally

received the Charge on behalf of both agencies and deemed the Charge to be "initially instituted" with the ICRC.   (In the work-sharing agreement, the EEOC and ICRC reciprocally designated each other as agents for receiving charges of unlawful employment practices.)   The EEOC sent a copy of the Charge to the ICRC, notified the ICRC that the Charge "is to be initially investigated by the EEOC," *id.* at 3000, and began its investigation.[1]

Because the EEOC deemed the Charge to be "initially instituted" with the ICRC, Ms. Starke's Charge was timely filed as to any alleged unlawful employment practice occurring on or after February 4, 2005, *i.e.*, any such practice occurring within 300 days of the filing of the Charge.   In relevant part, Title VII's statute of limitations provides:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred . . . , except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State . . . with authority to grant or seek relief from such practice . . . , such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred . . . .

42 U.S.C. § 2000e-5(e)(1); *see, e.g., Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 359, 360 n.8 (1977) ("If a charge has been initially filed with or referred to a state . . . agency, it must be filed with the EEOC within 300 days after the practice occurred . . . .").   An influential treatise explains

> there is a dual aspect to the Title VII limitations periods; they have a retrospective, as well as a prospective, aspect.   In other

---

[1] The ICRC waived its right to exclusive jurisdiction over charges initially instituted with it.   For further explanation of the work-sharing agreement, see *Millage v. City of Sioux City*, 258 F. Supp. 2d 976, 985-86 (N.D. Iowa 2003) (Bennett, C.J.).   Here, the ICRC filed the Charge on December 5, 2005 but apparently stayed its own investigation pending the EEOC proceedings.

> words, not only must charges be filed within 180 (or 300) days
> after a discriminatory event, but also, as a general rule, the
> aggrieved party can only achieve redress for discriminatory
> acts which occurred 180 (or 300) days prior to the filing of
> charges.

4 Lex K. Larson, *Employment Discrimination* § 72.02, at 72-5 (2d ed. July 2008).

### 3. The EEOC's investigation

Upon receipt of the Charge, the EEOC immediately notified CRST of Ms. Starke's allegations. The EEOC ordered CRST to file a response to the Charge on or before December 30, 2005. The record does not disclose CRST's response to Ms. Starke's allegations.

The nature, scope and duration of the EEOC's investigation is unknown to the court. Further, it is unclear to what extent the EEOC attempted to conciliate Ms. Starke's allegations with CRST.[2] What *is* certain is that Ms. Starke never exercised her right to file a Title VII lawsuit against CRST while her Charge was pending before the EEOC. Title VII grants the charging party who is unwilling to await the conclusion of extended EEOC proceedings a right to file suit 180 days after the charge was filed. 42 U.S.C. § 2000e-5(f)(1); *Occidental Life*, 432 U.S. at 361.

### B. The EEOC's Complaint

On September 27, 2007, nearly two years after Ms. Starke filed her Charge, the EEOC filed the instant lawsuit on behalf of Ms. Starke "and a class of similarly situated female employees of [CRST] . . . ." Complaint (docket no. 2), at 1. Pursuant to 42 U.S.C. § 2000e-5(f)(1) and (3) and 42 U.S.C. § 1981a, the EEOC purports to bring suit

---

[2] Title VII requires the EEOC to engage in "informal methods of conference, conciliation, and persuasion" before filing suit. 42 U.S.C. § 2000e-5(b). CRST does not complain that the EEOC failed to conciliate the allegations of Ms. Starke or anyone else. *Cf. EEOC v. Dial Corp.*, 156 F. Supp. 2d 926, 940 (N.D. Ill. 2001) (making clear the EEOC and the defendant conciliated claims of all "class" members).

in its own name "to correct [CRST's] unlawful employment practices on the basis of sex, and to provide appropriate relief to [Ms.] Starke and a class of similarly situated female employees of [CRST] who were adversely affected by such practices." First Amended Complaint ("EEOC's Complaint") (docket no. 8), at 1.[3] The EEOC generally alleges that Ms. Starke and the other similarly situated women "were adversely affected . . . when their lead drivers or team drivers subjected them to sexual harassment and to a sexually hostile working environment based on their gender, and CRST failed to prevent, correct, and protect them . . . ." *Id.*

The heart of the EEOC's Complaint contains the following specific allegations against CRST:

> 7.    Since at least July 2005, CRST engaged in unlawful employment practices in violation of Sections 703(a) and 704(a) of Title VII, 42 U.S.C. §§ 2000e-2 and 2000e-3. Among other things, two of its lead drivers subjected [Ms.] Starke to sexual harassment during their supervision of [her] (including, but not limited to, unwelcome sexual conduct, other unwelcome physical touching, propositions for sex, and sexual comments), which further created a sexually hostile and offensive work environment. CRST is liable for the harm caused by the harassment and the hostile and offensive work environment because of the actions of its lead drivers and because of its failure and refusal to take prompt and appropriate action to prevent, correct, and protect [Ms.] Starke from the harassment and the hostile work environment, culminating in her discharge from employment with CRST.

> 8.    Other similarly situated female employees of CRST were also subjected to sexual harassment and a sexually hostile and offensive work environment while working for CRST, including, among other things, unwelcome sexual conduct, other unwelcome physical touching, propositions for sex, and

---

[3] The EEOC's Complaint, filed on November 16, 2007, corrected a typographical error in the Complaint. Ruling (docket no. 31), at 1 n.1.

sexual comments from their lead drivers or team drivers.
CRST is liable for harm caused by the harassment and the
hostile and offensive work environment because of the actions
of its lead drivers or team drivers and because of its failure
and refusal to take prompt and appropriate action to prevent,
correct, and protect its female employees from the harassment
and the hostile environment.

9.      The effect of the practices complained of in Paragraphs
7 and 8 above has been to deprive [Ms.] Starke and class of
similarly situated female employees of equal employment
opportunities, and to otherwise adversely affect their status as
employees, because of sex.

EEOC's Complaint at 2-3.  The EEOC alleges that CRST's actions "were intentional" and
"done with malice or with reckless indifference to the federally protected rights of [Ms.]
Starke and the class of similarly situated female employees." *Id.* at 3.

The EEOC asks the court for "a permanent injunction enjoining CRST and its
officers, successors, and assigns, and all persons in active concert or participation with
them, from engaging in sexual harassment [and] any other employment practice which
discriminates on the basis of sex." *Id.* at 4.  The EEOC further asks the court to "[o]rder
CRST to institute and carry out policies, practices, and programs which provide equal
employment opportunities for women, and which eradicate the effects of its past and
present unlawful employment practices." *Id.*  Finally, the EEOC asks the court to order
CRST to pay Ms. Starke and the similarly situated female employees compensatory
damages, punitive damages and ordinary costs.  The requested compensatory damages
include back pay, pre-judgment interest, front pay and recompense for "emotional pain,
suffering, and humiliation." *Id.*

Notably, the EEOC did *not* that allege CRST was engaged in "a pattern or practice"
of illegal sex-based discrimination or otherwise plead a violation of 42 U.S.C. § 2000e-6.
Further, the EEOC's Complaint does not state with particularity how Ms. Starke or the

other similarly situated women exhausted their administrative remedies. The EEOC simply represents that, "[m]ore than 30 days prior to the institution of [the] lawsuit, [Ms. Starke], then a CRST employee, filed a charge with the EEOC alleging violations of Title VII by CRST." *Id.* Similarly, it is unclear why the EEOC used Ms. Starke's Charge to file this lawsuit on behalf of an untold number of similarly situated women—all of whom remain unnamed in the EEOC's Complaint. In other words, it is unknown what led the EEOC to use the Charge as "a jurisdictional springboard." *EEOC v. Gen. Elec. Co.*, 532 F.2d 359, 364 (4th Cir. 1976) (cited with approval in *Gen. Tel. Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 331 (1980) ("Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable.")).

On November 30, 2007, CRST filed an Answer and Affirmative Defenses (docket no. 11). On May 1, 2008, CRST filed an Amended Answer and Affirmative Defenses ("Answer") (docket no. 36) to assert an additional affirmative defense. CRST denies the substance of the EEOC's Complaint and asserts seven affirmative defenses, including but not limited to waiver or release, failure to exhaust administrative remedies and "untimel[iness]." Answer at 2.

### C. Scheduling

On February 8, 2008, the court adopted the parties' Scheduling Order and Discovery Plan ("Scheduling Order") (docket no. 21). Among other things, the parties agreed to a December 7, 2008 deadline for completion of discovery and a trial ready date of May 15, 2009. The parties estimated trial would last twenty days. In reliance upon the parties' representations, the court scheduled the trial to commence at some time "during the two-week period beginning on June 15, 2009" with the exact dates and times of the trial to be determined closer in time to the trial date. Trial Management Order (docket no. 22), at 1 (emphasis omitted).

### D.  Other Allegedly Aggrieved Persons

#### 1.    Unnecessary confusion

The vague reference in the EEOC's Complaint to "[Ms.] Starke and a class of similarly situated female employees" has added unnecessary confusion to this case in at least two respects:

First, the EEOC's use of the phrase "[Ms.] Starke and a class of similarly situated female employees" does not comport with the language or structure of the statute upon which it sued, 42 U.S.C. § 2000e-5.  The phrase naturally evokes the thought of Ms. Starke as the named plaintiff in a Rule 23 class action against CRST.  To the contrary, it is settled that "the EEOC may maintain its [§ 2000e-5(f)(1)] civil actions for the enforcement of Title VII and may seek specific relief for a group of aggrieved individuals without first obtaining class certification pursuant to Federal Rule of Civil Procedure 23." *Gen. Tel.*, 446 U.S. at 333-34 (footnote omitted).  For example, the EEOC may pursue relief on behalf of a group of allegedly aggrieved persons "even though competing interests are involved," *id.* at 331, or even if there is "a huge variance in the nature and extent of the injuries suffered" within such group, *In re Bemis Co.*, 279 F.3d 419, 421 (7th Cir. 2002) (Posner, J.).  Any limitation upon the EEOC to sue only on behalf of "similarly situated female employees" in this case was self-imposed.

To remedy any confusion on this point, the court refers to the "similarly situated female employees" exactly as the relevant part of Title VII refers to them: as "allegedly aggrieved persons." *See* 42 U.S.C. § 2000e-5(f)(1) (referring to "[t]he person or persons aggrieved" and "the person aggrieved").  The court refrains from referring to the "similarly situated female employees" as "class members." *See, e.g., EEOC v. Scolari Warehouse Mkts., Inc.*, 488 F. Supp. 2d 1117, 1124 n.2 (D. Nev. 2007) (declining to refer to allegedly aggrieved persons as "class members"); *see also Gen. Tel.*, 446 U.S. at 323 n.5 (noting the EEOC refrained from characterizing a 42 U.S.C. § 2000e-5 lawsuit as a

9

"class action" and instead called it an action "affecting a class of individuals"). *But see EEOC v. Int'l Profit Assocs., Inc.*, No. 01-C-4427, 2007 WL 3120069, *1 n.1 (N.D. Ill. Oct. 23, 2007) (using term "class"); *EEOC v. Dial Corp.*, 156 F. Supp. 2d 926, 946 n.13 (N.D. Ill. 2001) (similar); *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 990 F. Supp. 1059, 1076 n.10 (C.D. Ill. 1998) (similar).

Second, in the early stages of this litigation it was unclear how many "similarly situated female employees" on whose behalf the EEOC was seeking individual relief.[4] The EEOC's Complaint does not indicate whether there were two, twenty or two thousand "similarly situated female employees."[5] The EEOC had agreed, however, to the Scheduling Order, which "[e]stimated [the] length of trial" to be "**20** days." Scheduling Order at 2 (emphasis in original). The court accepted this representation when planning its schedule.

As discovery progressed, it became clear to the court that the EEOC did not know how many allegedly aggrieved persons for whom it was seeking relief and was using discovery to find them. On May 29, 2008, for example, the EEOC sent 2,000 letters to former CRST female employees to solicit their participation in this lawsuit. On September 28, 2008, the EEOC sent another 730 solicitation letters to former CRST female employees. CRST has produced more than 200,000 pages of documents to the EEOC in this case. *Cf. Dial*, 156 F. Supp. 2d at 938 (recounting but rejecting the defendant's

---

[4] On September 26 and December 8, 2008, the court granted Mss. Starke, Janet Boot, Barbara Grant, Cindy Moffett, Remcey Jeunenne Peeples, Latesha Thomas and Nicole Ann Cinquemano ("Plaintiffs-Interveners") permission to intervene in the instant lawsuit, pursuant to 42 U.S.C. § 2000e-5(f)(1) and Federal Rule of Civil Procedure 24. Because Plaintiffs-Interveners did not respond to the Motion, the court does not discuss their claims in the instant Order.

[5] While generality might be expected in a Rule 23 class-action complaint, the EEOC has a duty to investigate and conciliate allegations *before* filing suit on them under 42 U.S.C. § 2000e-5. *See supra* note 2 (discussing § 2000e-5(b)).

argument that the EEOC had "made no effort to identify class members until several months after it filed the . . . action, when it sent a letter to approximately 400 current and former female employees").

There was a risk this case would drag on for years as the EEOC conducted wide-ranging discovery and continued to identify allegedly aggrieved persons. The EEOC's litigation strategy was untenable: CRST faced a continuously moving target of allegedly aggrieved persons, the risk of never-ending discovery and indefinite continuance of trial.

### 2. Case management orders

On August 7, 2008, the EEOC filed a Motion to Modify the Scheduling Order (docket no. 37). On August 8, 2008, CRST filed a Response (docket no. 38), in which it agreed certain modifications to the Scheduling Order were appropriate but also asked the court to establish a date "by which [the] EEOC completes its identification of class members." Response (docket no. 38), at 4. In a Reply (docket no. 42), the EEOC stated that it had identified "a total of 49 class members so far," predicted the "total class will reach between 100 and 150 individuals," indicated it believed it could identify "the bulk of the class members" by October 15, 2008, and suggested a December 7, 2008 deadline for identifying the "class members." Reply (docket no. 42), at 1-3.

On August 20, 2008, United States Magistrate Judge Jon S. Scoles issued an Order Modifying Discovery Plan (docket no. 44). Among other things, Judge Scoles set a October 15, 2008 deadline for the EEOC "to disclose the identity of class members." Order Modifying Discovery Plan (docket no. 44), at 2. Judge Scoles also continued the parties' previously agreed-upon discovery deadline to January 15, 2009. As far as the court is aware, CRST has consistently intended to exercise its right to depose all allegedly aggrieved persons on whose behalf the EEOC seeks monetary damages.

By October 15, 2008, the EEOC had identified approximately 270 aggrieved persons to CRST. This total was much greater than CRST had anticipated based upon the

11

EEOC's representations to the court.  *See, e.g.,* Response (docket no. 42), at 1-2 (estimating "the total class will reach between 100 and 150 individuals"); Scheduling Order at 2 (estimating a twenty-day trial).

On November 6, 2008, CRST filed a "Motion under Rule 16(f) for an Order to Show Cause Concerning the EEOC's Identification of Class Members" ("Motion to Show Cause") (docket no. 56).  CRST alleged that the EEOC did not have a good-faith basis for naming so many allegedly aggrieved persons; CRST accused the EEOC of adopting a policy of "naming everyone and asking questions later" just before the October 15, 2008 deadline.  Brief in Support of Motion to Show Cause (docket no. 56-2), at 10.  CRST alleged that the EEOC had simply added a large number of names found in CRST's human resources files without ever speaking to those individuals.  Further, the EEOC had indicated to CRST that it reserved unto itself the option in the future "to remove some women from this list at a later date."  *Id.* at 11.

In ruling upon the Motion to Show Cause, the undersigned held that the EEOC had complied with the letter, if not the spirit, of Judge Scoles's order.  The court took the EEOC at its word that it had a good-faith belief that each and every one of the approximately 270 women it had disclosed to CRST before the deadline had an actionable claim for sex discrimination.  Recognizing that the EEOC is "the master of its own case" (in the sense that it has the statutory authority to proceed on behalf of allegedly aggrieved persons without their consent), *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 291 (2002), the court declined to "strike" all women who had not given the EEOC informed consent to proceed on their behalf in this case.  The court expressed concern, however, that "CRST [still] might unfairly face a 'moving target' of prospective plaintiffs as discovery winds down and trial approaches."  Order (docket no. 66), at 8.

The court invoked its inherent case management authority, Fed. R. Civ. P. 26(f), Fed. R. Civ. P. 16(b) and LR 16, and adopted the following three rules going forward to

forestall any prejudice to CRST.  The court ordered the EEOC to (1) immediately file with the court a corrected list of the approximately 270 allegedly aggrieved persons it had disclosed to CRST on October 15, 2008 (the list the EEOC previously disclosed contained many errors); (2) immediately inform CRST and file an amended disclosure list with the court as soon as it learned that it no longer wished to pursue individual claims on behalf of any of the women on the list; and (3) make all allegedly aggrieved persons on whose behalf the EEOC sought relief available to CRST for a deposition before the conclusion of discovery on January 15, 2009.  The court then ordered: "If the EEOC fails to make a woman available, as a discovery sanction the court will not permit her to testify at trial and will bar the EEOC from seeking relief on her behalf in this case." *Id.* at 9.

Subsequently, the EEOC made approximately 150 of the 270 allegedly aggrieved women available for deposition.  It appears CRST deposed all of the women whom the EEOC made available.  At present, therefore, the EEOC intends to seek individual relief for approximately 150 allegedly aggrieved persons at trial.  The EEOC desires to seek individual relief for an additional "99 women who were not deposed and therefore are subject to the discovery sanction."   Response to Motion to Strike (docket no. 187), at 2.  Because the EEOC did not make these women available to CRST for deposition prior to January 15, 2009, the EEOC may not seek relief for them.

### E.  Motion

On February 13, 2009, CRST filed the Motion.  CRST asks the court to "grant summary judgment in its favor against [the] EEOC on the pattern or practice claim." Defendant's Brief in Support of Motion ("Def.'s Br.") (docket no. 150-2), at 21.  On March 16, 2009, the EEOC filed a Resistance (docket no. 168).  On March 31, 2009, CRST filed a Reply (docket no. 185).  On April 21, 2009, with permission of the court,

CRST filed a Surreply (docket no. 194).[6]

CRST requests oral argument on the Motion. The court finds oral argument is not appropriate. The Motion is fully submitted and ready for decision.

### III. STATUTORY FRAMEWORK

A brief outline of the relevant statutory framework helps to place the Motion in its proper context. At first glance the Motion is odd, because it asks the court to dismiss a "pattern or practice claim" when no such claim appears in the EEOC's Complaint.

#### A. Sexual Harassment is Sex Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). "The Supreme Court has determined . . . that sexual harassment 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' qualifies as [unlawful] sex discrimination under Title VII." *Adams v. O'Reilly Auto., Inc.*,

---

[6] The EEOC's resistance materials contained numerous typographical errors. On April 13, 2009, the court ordered the EEOC to correct them but explicitly cautioned: "Plaintiff may only correct its prior typographical and technical errors. Plaintiff is not permitted to change any aspect of its arguments in connection with pending motions or any other substantive aspect of its filings. Order (docket no. 190), at 2 (emphasis in original). The EEOC violated the court's order. The EEOC did not merely correct its typographical and technical errors but instead elaborated upon and changed various substantive aspects of its responses to CRST's statements of individual material fact. *Compare, e.g.*, Response to Statement of Material Facts Nos. 10 & 19 (docket no. 168-2), *with* Corrected Response to Statement of Material Facts Nos. 10 & 19 (docket no. 168-4). In a more limited respect it also perpetuated its prior failure to comply with the Local Rules. *See, e.g.*, Corrected Response to Statement of Material Facts No. 19 (citing "P/P App. at 1-1386," *its entire appendix*, to refute CRST's assertions that (1) CRST's official policy prohibits sexual harassment and (2) CRST's officers and administrators all testified that CRST does not tolerate sexual harassment). However the EEOC may characterize its changes as a mere "rearrangement" of its previously submitted materials, at the very least the EEOC should have alerted the court before making such substantial revisions.

538 F.3d 926, 928 (8th Cir. 2008) (quoting *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986)).  In *Meritor*, the Supreme Court explained:

> The phrase "terms, conditions, or privileges of employment" [within 42 U.S.C. § 2000e-2(a)(1)] evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment.
>
> * * *
>
> [S]exual misconduct constitutes prohibited sexual harassment, whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.
>
> * * *
>
> Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.
>
> Of course . . . not all workplace conduct that may be described as "harassment" affects a "term, condition, or privilege" of employment within the meaning of Title VII. For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.

477 U.S. at 64-67 (citations and internal quotation marks omitted).

To prove sex discrimination based upon a hostile work environment theory of sexual harassment, then, a plaintiff must prove "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (citing *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)).  In addition,

> if the harassment was committed by a co-worker, [a plaintiff] must . . . establish that [the employer] "knew or should have known of the conduct and failed to take proper remedial action." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 987 (8th Cir. 1999).  On the other hand, if the harassment was committed by an employee who supervised [the plaintiff], [the employer] is vicariously liable for the harassment unless it can establish the affirmative defense defined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).

*Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004).  That is,

> [the employer] is vicariously liable for harassment by its supervisory personnel unless it can establish that (1) [it] exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) [the plaintiff] unreasonably failed to take advantage of the preventive or corrective opportunities provided by [the employer].  [*Ellerth*, 524 U.S. at 765].  An employer may assert the affirmative defense only "[w]hen no tangible employment action is taken."  [*Faragher*, 524 U.S. at 807-08].

*Gordon*, 469 F.3d at 1195.

To prove sexual harassment is sufficiently unwelcome to be actionable under Title VII, a plaintiff must meet an objective standard and a subjective standard regarding the harassment itself.  With respect to the objective standard, the Supreme Court has made clear over the years that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "Title VII does not mandate an employment environment worthy of a Victorian salon." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1017 (8th Cir. 1988).  "White gloves, crystal, and fine china are neither required nor expected." *Jenson*

*v. Eveleth Taconite Co.*, 139 F.R.D. 657, 662 (D. Minn. 1991) ("*Jenson I*").[7]  Title VII was not designed to "displace all ribaldry on the roadway," and "[o]ne may well expect that . . . language of the barracks will always predominate over that of the ballroom." *Hall*, 842 F.2d at 1017-18.  With respect to the subjective standard, it is settled that, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21-22.

## B. Differences Between "§ 706" & "§ 707"
### Lawsuits by the EEOC

Two distinct parts of Title VII separately authorize the EEOC to bring suit in its own name to ferret out unlawful sex discrimination: § 706 of Title VII, 42 U.S.C. § 2000e-5 ("§ 706"), and § 707 of Title VII, 42 U.S.C. § 2000e-6 ("§ 707").

### 1.    Lawsuits under § 706

Section 706 permits the EEOC to sue a private employer on behalf of a "person or persons aggrieved" by the employer's unlawful employment practice. 42 U.S.C. § 2000e-5(f)(1).  The EEOC may file a § 706 lawsuit against a private employer, after the filing of a charge of unlawful employment discrimination with the EEOC, if the EEOC finds "reasonable cause" the employer has violated Title VII.  *Id.*; *see, e.g., Occidental Life,* 432 U.S. at  359-60 (summarizing process for the EEOC to file a § 706 lawsuit).  In *General Telephone*, the seminal § 706 case, the Supreme Court succinctly explained:

> Title VII . . . authorizes the procedure that the EEOC followed
> in this case.  Upon finding reasonable cause to believe that [a
> private employer] had discriminated against female employees
> [upon the filing of four individual charges of discrimination

---

[7]  The court discusses *Jenson v. Eveleth* in greater detail in Part III.C.2 *infra*. *Jenson* is perhaps one of the most famous employment discrimination cases in the Eighth Circuit.  Hollywood made the case famous in the 2005 film *North Country*, which starred actors Charlize Theron, Frances McDormand, Woody Harrelson and Sissy Spacek.

> with the EEOC], the EEOC filed suit . . . . [T]he EEOC need
> look no further than § 706 for its authority to bring suit in its
> own name for the purpose, among others, of securing relief for
> a group of aggrieved individuals.

446 U.S. at 324.

The EEOC is "master of its own case" when bringing suits on behalf of aggrieved persons in a § 706 lawsuit. *Waffle House*, 534 U.S. at 291. For example, it may bring suit with or without the consent of the aggrieved persons. *Id.* at 291-92. Nonetheless, it is axiomatic that the EEOC stands in the shoes of those aggrieved persons in the sense that it must prove all of the elements of their sexual harassment claims to obtain individual relief for them. Likewise, the full range of legal remedies available to individuals is generally available to the EEOC if the EEOC prevails on their behalf. The EEOC is entitled to equitable relief, 42 U.S.C. § 2000e-5(g), and may also usually pursue compensatory and punitive damages, 42 U.S.C. § 1981a(a)(1).

### 2.    Lawsuits under § 707

Section 707 permits the EEOC to bring suit against employers whom it has reasonable cause to believe are engaged in "a pattern or practice" of unlawful employment discrimination. 42 U.S.C. § 2000e-6; *see also Gen. Tel. Co.*, 446 U.S. at 327 n. 9 ("If, for any reason, [the] EEOC . . . . believes a pattern or practice of discrimination exists in [a private employer], its recourse is to file a suit under § 707." (citations and emphasis omitted)). Like § 706, § 707 grants the EEOC the right to seek equitable relief against employers found to have intentionally engaged in a pattern or practice of unlawful employment discrimination. 42 U.S.C. § 2000e-6(a). Unlike § 706, however, the EEOC is not authorized to seek compensatory or punitive damages under § 707; the relevant portion of 42 U.S.C. § 1981a only authorizes recovery of compensatory and punitive damages "[i]n an action brought by a complaining party under [§ 706]." 42 U.S.C. § 1981a(a)(1).

"A pattern or practice case seeks to eradicate systemic, company-wide discrimination and focuses on an objectively verifiable policy or practice of discrimination by a private employer against its employees." *Mitsubishi*, 990 F. Supp. at 1070. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977) is the seminal § 707 case. In *Teamsters*, the United States[8] alleged a company, with the assistance of a union, engaged in a pattern or practice of discriminating against certain persons in failing to recruit, hire, transfer and promote them to higher paying, more desirable jobs, including "line driver" jobs, on an equal basis with white persons. 431 U.S. at 335. The United States brought the lawsuit under § 707 and alleged the company had engaged in a "pattern or practice" of unlawful employment discrimination. *Id.* at 328-29. The United States sought injunctive and other equitable relief, including "make whole" relief that would allow discriminatees to transfer to line driver positions without losing seniority. *Id.* at 330.

The United States presented damning statistical evidence to prove its pattern or practice claim:

> As of March 31, 1971, shortly after the Government filed its complaint alleging systemwide discrimination, the company had 6,472 employees. Of these, 314 (5%) were Negroes and 257 (4%) were Spanish-surnamed Americans. Of the 1,828 line drivers, however, there were only 8 (0.4%) Negroes and 5 (0.3%) Spanish-surnamed persons, and all of the Negroes had been hired after the litigation had commenced. With one exception—a man who worked as a line driver at the Chicago terminal from 1950 to 1959—the company and its predecessors *did not employ a Negro on a regular basis as a line driver until 1969.* And, as the Government showed, even in 1971 there were terminals in areas of substantial Negro population

---

[8] Section 707 originally authorized the Attorney General of the United States to bring "pattern or practice" lawsuits. The authority now rests with the EEOC. *Teamsters*, 431 U.S. at 329 n.1 (discussing 1972 amendments to Title VII).

> where all of the company's line drivers were white. A great
> majority of the Negroes (83%) and Spanish-surnamed
> Americans (78%) who did work for the company held the
> lower paying city operations and serviceman jobs, whereas
> only 39% of the nonminority employees held jobs in those
> categories.

431 U.S. at 337-38 (footnotes omitted, emphasis in original).   The United States also
"bolstered its statistical evidence with the testimony of individuals who recounted over 40
specific instances of discrimination." *Id.* at 338.

After a trial, the district court found by a preponderance of the evidence that the
company had engaged in a pattern or practice of unlawful employment discrimination. *Id.*
at 330-31.   The district court granted most of the United States's requested equitable relief.
*Id.* at 331-32.   On appeal, the Supreme Court held that there was sufficient evidence in the
record to support the district court's determination that the employer had engaged in a
pattern or practice of unlawful employment discrimination. *Id.* at 337.

In affirming the judgment of the district court on this issue, the Supreme Court set
forth the governing legal standard for pattern or practice claims.   The standard survives
to this date.   To prove a pattern or practice claim, the EEOC must "establish by a
preponderance of the evidence that racial discrimination was the company's standard
operating procedure—the regular rather than the unusual practice." *Id.* at 336.   That is,
the EEOC is required "to prove more than the mere occurrence of isolated or 'accidental'
or sporadic discriminatory acts." *Id.*   In a footnote, the Supreme Court observed that "the
'pattern or practice" language in [§ 707] was not intended as a term of art, and the words
reflect only their usual meaning." *Id.* at 336 n.16 (citation omitted).   A pattern or practice
is

> "present only where the denial of rights consists of something
> more than an isolated, sporadic incident, but is repeated,
> routine, or of a generalized nature. There would be a pattern
> or practice if, for example, a number of companies or persons

20

> in the same industry or line of business discriminated, if a
> chain of motels or restaurants practiced racial discrimination
> throughout all or a significant part of its system, or if a
> company repeatedly and regularly engaged in acts prohibited
> by the statute. The point is that single, insignificant, isolated
> acts of discrimination by a single business would not justify a
> finding of a pattern or practice . . . ."

*Id.* (quoting Statement of Senator Humphrey, 110 Cong. Rec. 14270 (1964)); *see also Catlett v. Mo. Hwy. & Transp. Comm'n*, 828 F.2d 1260, 1265 (8th Cir. 1987) ("A pattern or practice is present when the discriminatory acts were not isolated, insignificant, or sporadic, but were repeated, routine or of a generalized nature[.]"); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 486 (8th Cir. 1984) (Swygert, J., sitting by designation, dissenting in part) ("What must be proved . . . is that the employer engaged in a consistent rather than a sporadic pattern of discrimination.").

The Supreme Court also adopted a burden-shifting framework for pattern or practice suits in which disparate treatment on the basis of race is alleged.  The Court explained:

> The plaintiff in a pattern-or-practice action is the Government,
> and its initial burden is to demonstrate that unlawful
> discrimination has been a regular procedure or policy followed
> by an employer or group of employers. At the initial,
> "liability" stage of a pattern-or-practice suit[,] the Government
> is not required to offer evidence that each person for whom it
> will ultimately seek relief was a victim of the employer's
> discriminatory policy. Its burden is to establish a prima facie
> case that such a policy existed. The burden then shifts to the
> employer to defeat the prima facie showing of a pattern or
> practice by demonstrating that the Government's proof is
> either inaccurate or insignificant. An employer might show,
> for example, that . . . during the period it is alleged to have
> pursued a discriminatory policy it made too few employment
> decisions to justify the inference that it had engaged in a
> regular practice of discrimination.
>
> If an employer fails to rebut the inference that arises from the

21

Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief. Such relief might take the form of an injunctive order against continuation of the discriminatory practice, an order that the employer keep records of its future employment decisions and file periodic reports with the court, or any other order "necessary to ensure the full enjoyment of the rights" protected by Title VII.

When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief. [A]s is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking.

The proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy. The Government need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination. [T]he burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons.

*Teamsters*, 431 U.S. at 360-62 (footnotes and citations omitted); *see also Craik*, 731 F.2d at 470 (clarifying that in pattern-or-practice cases, at the remedial stage the burden of persuasion—not just the burden of production—shifts to the employer).

### 3.    *Summary of differences*

To summarize, "[t]here is a significant distinction between §§ 706 and 707 claims."

*Scolari*, 488 F. Supp. 2d at 1143.  As the Supreme Court has recognized:

> A Commissioner may file a charge in either of two situations.
> First, when a victim of discrimination is reluctant to file a
> charge . . . because of fear of retaliation, a Commissioner may
> file a charge on behalf of the victim. [42 U.S.C. § 2000e-5.]
> Second, when a Commissioner has reason to think that an
> employer has engaged in a "pattern or practice" of
> discriminatory conduct, he may file a charge on his own
> initiative.  [42 U.S.C.] § 2000e-6.

*EEOC v. Shell Oil Co.*, 466 U.S. 54, 62 (1984); *see also Mitsubishi*, 990 F. Supp. at 1084

n.18 ("The Supreme Court's statements [in *Shell Oil*] recognize the difference between a

§ 706 and a § 707 case, by indicating that a Commissioner's charge under § 706 is filed

on behalf of an individual, whereas a Commissioner's charge under § 707 is filed on "his

own initiative" for the purpose of alleging a pattern or practice of discrimination rather

than individual discrimination.").

Similarly, the Tenth Circuit Court of Appeals observed:

> The EEOC is . .  authorized to file two types of civil actions
> to redress employment discrimination. Under [§] 707, it may
> bring a civil action when it determines that there is "reasonable
> cause to believe that any person or group of persons is engaged
> in a pattern or practice of resistance to the full enjoyment of
> any of the rights secured (by provisions of the Act relating to
> employment discrimination), and that the pattern or practice is
> of such a nature and is intended to deny the full exercise of the
> rights herein described . . .." 42 U.S.C. [§] 2000e-6(a).
>
> Section 706, on the other hand, is addressed to vindication of
> individual instances of employment discrimination. [The]
> EEOC['s] involvement is initiated by the filing of a specific
> charge of employment discrimination. The EEOC must
> investigate and make a finding as to reasonable cause. If
> reasonable cause is found to support the charge, the next step

is conciliation. Only when conciliation is attempted and the efforts fail may the EEOC enter into litigation under [§] 706.

*EEOC v. Cont'l Oil Co.*, 548 F.2d 884, 887 (10th Cir. 1977).

Finally, one district court elaborated:

> [A] § 706 case is based on one or more individual charges or complaints of unlawful discrimination by an employer, and a § 707 case is based on a pattern or practice of systemic discrimination by an employer. Although both a § 706 case and a § 707 case can be filed by the EEOC in its own name and initiated by a "Commissioner's charge," rather than an individual charge, the converse is not true. A § 707 case cannot be initiated by an individual charge, and it cannot be filed as a civil suit by an individual. A § 707 case is a "pattern or practice" case that challenges systemic, wide-spread discrimination by an employer. Conversely, a § 706 case seeks to vindicate, sometimes on a class-wide basis, the rights of aggrieved individuals who are challenging an unlawful employment practice by an employer. The distinction is subtle and not immediately apparent from the language of Title VII, but it is, nonetheless, an important distinction.

*Mitsubishi*, 990 F. Supp. at 1084 (citation and footnote omitted).

### 4.    *Confusion in this case*

"Notwithstanding [the] differences [between the two statutes], courts have blurred the line between class-wide claims brought pursuant to § 706 and pattern-or-practice claims brought pursuant to § 707." *Scolari*, 488 F. Supp. 2d at 1143 (citations omitted); *see, e.g., Dial*, 156 F. Supp. 2d at 969 (concluding that "a pattern-or-practice action can be brought, both as a general matter and in this case, for sexual harassment claims under §§ 706 and 707 of Title VII"). Not surprisingly, it appears much confusion has already crept into this case. The EEOC is pursuing matters in this case that it did not plead or allege in the EEOC's Complaint.

The EEOC's Complaint reads as if the EEOC were asserting a prototypical § 706

action.   The EEOC squarely pled a violation of § 706.   The EEOC did not plead a violation of § 707, and the phrase "pattern or practice"— a phrase with which the EEOC is familiar—appears nowhere in the EEOC's Complaint.   Consistent with its decision to only plead a violation of § 706, the EEOC seeks compensatory and punitive damages from CRST pursuant to 42 U.S.C. § 1981a.

In recent months, however, the EEOC has made clear to the court and CRST that it believes CRST had engaged in "a pattern or practice" of tolerating sexual harassment. *See, e.g.*, Brief in Resistance to Statute of Limitations ("Lim. Br.") (docket no. 165-1), at 4 ("This is a case brought by the [EEOC], alleging a pattern or practice of tolerating a hostile work environment based on sexual harassment.").   The EEOC belatedly sought bifurcation of trial in accordance with *Teamsters*.   It also announced its intention to invoke the *Teamsters* burden-shifting framework.

In sum, it would appear the EEOC is attempting to have its cake and eat it too. That is, the EEOC is attempting to avail itself of the *Teamsters* burden-shifting framework yet still seek compensatory and punitive damages under § 706.   *Cf. Dial*, 156 F. Supp. 2d at 930 (seeking compensatory and punitive damages in a § 707 lawsuit).   Complicating matters further, it is important to remember that the Supreme Court designed the *Teamsters* burden-shifting framework with only equitable relief in mind.   *See Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1290 n.4 (8th Cir. 1997) (discussing 1991 amendments to Title VII, which allowed plaintiffs to seek compensatory and punitive damages under § 706); *see also Bemis*, 279 F.3d at 421 (pointing out that merely injunctive relief and back pay and not "common-law-type damages" were available when the Supreme Court decided *General Telephone*).

Fortunately, the court need not cut through this cloud of confusion to rule on the Motion.   CRST does not argue that the EEOC's Complaint fails to state a "pattern or practice claim."   Indeed, CRST filed the instant Motion to seek its dismissal; presumably,

CRST does not seek to dismiss what it does not believe to exist.  Accordingly, the court assumes without deciding that at least one of two legal principles is true: either (1) § 706 somehow permits the EEOC to pursue a pattern or practice claim and thereby render § 707 a mere redundancy in the law[9] or (2) the EEOC has constructively amended its complaint to assert a § 707 claim against CRST in this lawsuit in addition to its § 706 claim.  In other words, the court assumes without deciding that this is a sexual harassment pattern or practice case.

### C.  Sexual Harassment Pattern or Practice Cases are Special

### 1.    The Teamsters model "breaks down"

Sexual harassment pattern or practice cases are special.  As several district courts have recognized over the last two decades, the *Teamsters* pattern or practice model "breaks down" when the unlawful employment practice at issue is sexual harassment based on a hostile work environment.  *Mitsubishi*, 990 F. Supp. at 1071; *see also Int'l Profit Assocs.*, 2007 WL 3120069, at *3 (similar); *Jenson v. Eveleth Taconite Corp.*, 824 F. Supp. 847, 875-76 (D. Minn. 1993) ("*Jenson II*") (similar).  One of the district courts to address the issue most recently observed:

> [I]n a race discrimination case[,] it is clear why a pattern or practice finding should have an effect on an employer's liability to individual claimants. If an employer has an established policy of making employment decisions with racial

---

[9] In response to a pending motion, the EEOC maintains that any distinction between §§ 706 and 707 "is not useful" because, in its view, both statutes authorize pattern or practice cases and require "identical" elements of proof. Lim. Br. at 10. Without citing any controlling legal authority, the EEOC concludes that "there is no difference between pleading either statute." *Id.* at 11; *see, e.g.*, *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 599 F.2d 322, 328-33 & nn.13-14 (9th Cir.) (appearing to reach conclusion that § 707 is a redundancy in the law), *aff'd on other grounds*, 446 U.S. 318 (1979); *Craik*, 731 F.2d at 468-70 (sanctioning use of *Teamsters* model in § 706 class action brought by private plaintiffs) (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772 (1976)); *see also Jenson*, 130 F.3d at 1299-1300 (discussed in Part III.C.2 *infra*).

animus in violation of Title VII, it is likely that any specific employment decision also violates Title VII, and if a particular decision was not discriminatory, the employer is in the best position to show why. However, the impact of a pattern or practice finding in a hostile work environment sexual harassment case is not so clear. In contrast with a race discrimination case—where the focus is on the employer's basis for making an employment decision that adversely affected the claimant—a sexual harassment case centers on the gravity of the conduct to which a claimant was exposed. The sexual harassment suffered by the claimant must have been severe or pervasive enough (measured both objectively and subjectively) to constructively alter the terms or conditions of the claimant's employment by creating a hostile work environment. Otherwise, no Title VII violation has occurred. Therefore, a finding that an employer had a pattern or practice of tolerating sexual harassment in violation of Title VII does not necessarily establish that an individual claimant was exposed to harassment or that the harassment an individual claimant suffered violates Title VII. It is thus unclear what effect a pattern or practice finding should have on an individual claimant's suit for damages.

*Int'l Profit Assocs.*, 2007 WL 3120069 at *3 (citations omitted).

### 2.    *The modified burden-shifting approach of* **Jenson II**

*Jenson II* was the first reported case to address the tension between the *Teamsters* burden-shifting framework and the Supreme Court's sexual harassment jurisprudence. Notwithstanding its status as a private class action lawsuit, *Jenson II* is similar to the case at bar insofar as the district court assumed the *Teamsters* burden-shifting framework applied to § 706. *Jenson II*, 824 F. Supp. at 860 (citing *Craik*, 731 F.2d at 470). As indicated in Part III.C.1 *supra*, the court assumes without deciding that the EEOC is properly pursuing a pattern or practice claim under § 706 on behalf of similarly situated aggrieved persons in this action, even though Congress apparently contemplated that the EEOC would bring its pattern or practice lawsuits under § 707 and *Teamsters* was a § 707

27

case in which only equitable relief was available.

After a bench trial, the district court found that the defendant-employer had engaged in a pattern or practice of sex discrimination. *Id.* at 874-88. Specifically, the court found that it was the company's standard operating procedure to tolerate a hostile work environment based on sex. *Id.* Among other things, the district court found that (1) men occupied virtually every supervisory and managerial position and created a "sexualized environment" for their female subordinates, *id.* at 885; (2) women worked in a largely unified work environment in which "[v]irtually all of the relevant testimony and evidence indicates that male employees, [including first-line supervisors,] felt free to and did exhibit sexually-focused material anywhere they chose," *id.* at 880; (3) "verbal statements and language reflect[ed] a sexualized, male-oriented, and anti-female atmosphere," *id.*; (4) plaintiffs presented expert testimony to show rampant "sex stereotyping" at work, *id.* at 880-81 & n.81; (5) the defendant-employer's management was aware and should have been aware of the hostile work environment, *id.* at 886-88; (6) the defendant-employer failed to establish a system for processing sexual harassment complaints, *id.* at 887; (7) the defendant-employer did not discipline harassers even though they were readily identifiable, *id.*; (8) no member of management was assigned the responsibility to curtail sexual harassment in the workplace, *id.*; and (9) the defendant-employer made "no effort" to communicate with its employees that sexual harassment was wrong, *id.* at 888.

In reaching these findings, the district court considered itself ordinarily bound to apply the *Teamsters* burden-shifting framework in § 706 private class action lawsuits. *Id.* at 860 (citing *Craik*, 731 F.2d at 470). However, the district court identified the tension between the *Teamsters* burden-shifting framework and the Supreme Court's sexual harassment jurisprudence and devised the following solution:

> Should the employer be found to have engaged in a pattern or practice of discriminating against women by maintaining a hostile environment, the plaintiff class will be eligible for

appropriate prospective relief and other remedies consistent with a finding of liability in other pattern or practice cases. However, the nature of a hostile environment claim mandates that the nature of the recovery phase differ from traditional pattern and practice cases. Specifically, a determination that the employer engaged in a pattern or practice of discrimination by maintaining a hostile environment does not entitle every member of the plaintiff class to a presumption that they were sexually harassed—the burden of persuasion does not shift to the employer. Instead, the burden of persuasion remains on the individual class members; each must show by a preponderance of the evidence that she was as affected as the reasonable woman. If this showing is made, the individual member is entitled to all the remedies available under Title VII . . . . In a hostile environment class action, therefore, every member of the plaintiff class remains a "potential victim" in the true sense of the term.

This result is dictated by the fact that the proof introduced during the liability phase cannot resolve a disparate issue of fact essential to claims alleging hostile environment: whether individual members of the plaintiff class were as affected as the reasonable woman would have been. Because the employee's subjective response to acts of sexual harassment is an essential part of proving a claim of hostile environment sexual harassment, a presumption that the employer discriminated against individual class members may not arise from a determination that the reasonable woman would have been affected by the acts of sexual harassment. Individual employees should not be allowed to circumvent an essential element of a hostile environment claim merely because they are permitted to pursue their claims as a class . . . .

Nevertheless[,] . . . liability to the class is established by a determination that the employer engaged in a pattern or practice of exposing women to acts of sexual harassment sufficient to alter the terms or conditions of the reasonable woman's employment. Accordingly, individual class members need only show that they were at least as affected as the

> reasonable woman. The other elements of a hostile
> environment claim are established by the court's determination
> in the liability phase of the proceedings.

*Id.* at 875-76 (citations and footnotes omitted). To rule to the contrary would "effectively shift[] to [the] defendant the burden of proof on an issue which is carried by the plaintiff in an individual action." *Id.* at 876 n.73. On appeal in *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997), the Eighth Circuit Court of Appeals adopted the district court's modification of the *Teamsters* burden-shifting framework in pattern or practice sexual harassment cases.

Some courts and commentators have overlooked the importance of the Eighth Circuit Court of Appeals's decision in *Jenson*. *Compare EEOC v. Carrols Corp.*, No. 5:98-CV-1772, 2005 WL 928634, at *2 n.4 ("[N]o Court of Appeals has yet addressed the question."), *Int'l Profit Assocs.*, 2007 WL 3120069, at *6 ("[N]o appellate courts have addressed this issue[.]") *and* Timothy G. Healy, Note, *Sexual Pattern: Why a Pattern or Practice Theory of Liability is Not an Appropriate Framework for Claims of Sexual Harassment*, 10 Roger Williams U. L. Rev. 537, 538 (2005) ("Healy Article") ("[T]he issue of whether sexual harassment cases can proceed under a pattern or practice framework . . . has received virtually no attention in the federal courts of appeals."), *with Mitsubishi*, 990 F. Supp. at 1078 n.13 (recognizing that the Eighth Circuit Court of Appeals "placed its imprimatur on the district court's conclusion that the burden shifting framework of . . . [*Teamsters*] applies in a pattern or practice class case to shift a burden of proof to the employer, once an individual has established the subjective elements of her case" (emphasis omitted). The significance of the Eighth Circuit Court of Appeals's opinion is perhaps obscured by the fact that much of the opinion is focused on unrelated issues and the Eighth Circuit Court of Appeals does not elaborate on its reasons for adopting the framework. This part of the opinion, however, is definitely not dicta. The Eighth Circuit Court of Appeals reversed and remanded on the issue of damages because

a special master had failed to apply the district court's modified *Teamsters* burden-shifting framework. After discussing *Teamsters*, the Eighth Circuit Court of Appeals stated:

> In the damages phase, the plaintiffs still were required to show they were as affected by that hostile environment as a reasonable woman would be affected. [*Jenson II*], 824 F. Supp. at 876)). However, once they made that showing, the burden of proof shifted to [the defendant-employer] to show that it was more likely than not that their decision to not return to work was not the product of the hostile work environment. On this basis, these claims for economic loss are remanded to the district court to be calculated under the proper burden-shifting principles.

*Jenson*, 130 F.3d at 1300. The Eighth Circuit Court of Appeals specifically expressed its holding as follows:

> We find the Special Master did not apply the appropriate burden-shifting principles in its analysis . . . . Specifically, the Special Master failed to place the burden of proof on [the defendant-employer] to show that the plaintiffs' resignations were *not* caused by the hostile working environment once the Special Master determined the individual plaintiff[s] had established the requisite subjective element of their hostile environment claim.

*Id.* at 1299 (emphasis in original).

### 3.    *Summary*

Accordingly, if the court finds that it was CRST's "standard operating procedure" to tolerate sexual harassment in its workplaces, the court must apply the *Teamsters* burden-shifting framework as modified by *Jenson II*. *Jenson II*'s modified burden-shifting framework is the law of the Eighth Circuit in hostile work environment sexual harassment pattern or practice cases. The court is obliged to decline to follow other district courts that have expressly rejected *Jenson II*, *see, e.g., Mitsubishi*, 990 F. Supp. at 1069-82, or

reached seemingly contrary results, *see, e.g., Dial*, 156 F. Supp. 2d at 947-49.[10]   The

---

[10]   *Mitsubishi* extended the *Teamsters* burden-shifting framework to sexual harassment cases without much reservation.  The court conceded its decision effectively eliminated the subjective element of the individual plaintiff's prima facie case, required modification of *Meritor* and *Harris* and obliterated some of the employer's individual defenses.  The district court reasoned that the subjective element was "virtually a formality" and shifting the burden of proof to a defendant "does not appear to be anything new in sexual harassment law, since that burden has essentially always been borne by the employer." 990 F. Supp. at 1078.  The district court also made the following circular argument:

> The Court's rationale for eliminating the subjective proofs necessary in an individual action at the pattern or practice stage is quite simple.  Sexual harassment claims involve individual questions and defenses which cannot be tried, as to the class, on common issues of liability.  This is the problem and the solution.

*Id.* at 1076 (footnote omitted).  *Dial* by and large followed *Mitsubishi* without revisiting the underlying arguments at issue.

*Mitsubishi* and *Dial* are controversial among district courts within the Seventh Circuit.  *See, e.g., Int'l Profit Assocs.*, 2007 WL 3120069, at *12 (declining to follow *Mitsubishi*, *Dial* and *Jenson II*).  Although *Mitsubishi* and *Dial* were two of the first sexual harassment pattern or practice cases in the country, "[i]t is worth noting that neither [case] ever reached trial[.]" *Id.* at *8.  The Seventh Circuit Court of Appeals has not placed its imprimatur on either case.

"The EEOC's primary role is that of a law enforcement agency and it is merely a detail that it pays over any monetary relief obtained to the victims of the defendant's violation . . . ." *Bemis*, 279 F.3d at 421.  As in *International Profit Associates*, however, throughout this case the EEOC has sought "to blend aspects of *Mitsubishi*, *Dial*, and *Jenson* to create an approach that will dramatically increase its odds of prevailing . . . , particularly with its ability to recover punitive and compensatory damages." *Id.* at *9; *see, e.g., EEOC v. CRST Van Expedited, Inc.*, No. 07-CV-95-LRR, 2009 WL 972855, *3 (N.D. Iowa Feb. 25, 2009) (forestalling the EEOC's attempt to recover punitive damages on a "class-wide basis").  Armed with *Mitsubishi* and *Dial*, it is not surprising few cases have gone to trial or reached the circuit courts of appeals.  *See* Healy Article at 537 (observing that pattern or practice cases are cumbersome and expensive to litigate) & 578 (discussing *Mitsubishi* and *Dial* and observing that the unwarranted extension of the *Teamsters* burden-shifting framework to sexual harassment pattern or practice cases "has

(continued...)

court must also decline one recent commentator's invitation to abandon the *Teamsters* burden-shifting framework altogether. *See* Healy Article at 538 ("When considering the inherently individualized nature of sexual harassment claims and all of the procedural problems as a whole, it is evident that a pattern or practice theory of liability is not an appropriate framework for bringing sexual harassment claims.").

### III.  THE MERITS

Assuming without deciding that this is a pattern or practice sexual harassment case and bound to the modified burden-shifting framework of *Jenson II*, the fighting issue in the Motion is whether the EEOC has presented the court with sufficient evidence to warrant a jury trial on its pattern or practice claim.

### A.  Standard for Summary Judgment

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248.  The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992)

---

[10](…continued)
resulted in substantial settlements").

(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).   Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

### B. Preliminary Evidentiary Rulings

For purposes of the Motion, the material facts are largely undisputed. First, each party expressly admits many of the other party's Local Rule 56 individual statements of material fact. Second, some of the EEOC's Local Rule 56.b.2 qualifications and denials of CRST's Local Rule 56.a.3 individual statements of material fact contain incorrect citations to the EEOC's appendix or otherwise lack support in the record. The court deems those respective statements to be admitted. *See* LR 56.b ("The failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact."); *see, e.g., Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032-33 (8th Cir. 2007) (affirming district court's decision to deem statements of material fact to be admitted). Third, some of the EEOC's Local Rule 56.b.3 statements of additional material fact are similarly deficient, and so the court declines to assume their truth. Finally, the court declines to consider any evidence that lacks foundation or would otherwise be inadmissible at trial. *See, e.g., Firemen's Fund Ins. Co. v. Thein*, 8 F.3d 1307, 1310 (8th Cir. 1993) ("The district court must base its

determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial."). For example, in its resistance materials the EEOC relies heavily upon complaints or reports of sex discrimination involving 99 women it failed to make available to CRST for deposition during discovery. Such complaints and related evidence is inadmissible for all of the reasons stated in Judge Scoles' Ruling (docket no. 193) granting in part CRST's Motion to Strike (docket no. 171).

### C.  Summary Judgment Facts

Viewed in the light most favorable to the EEOC and affording the EEOC all reasonable inferences, *Baer Gallery*, 450 F.3d at 820, the summary judgment facts are these:

### 1.     CRST's business model

CRST is a family-owned trucking business. It was founded in Cedar Rapids, Iowa, in 1955. It operates nationwide.

CRST owns the trucking industry's largest fleet of team-driven tractors. CRST offers "just in time" and other premium transportation services. CRST focuses on long-haul transport but also provides short-haul and regional deliveries, air cargo shipping and dedicated fleets.

CRST fills a "market niche" and makes deliveries faster than its competitors. Two drivers working together are able to make deliveries faster than one driver acting alone. A single CRST truck is able to operate as many as twenty-two hours a day, with each driver "at the wheel" for up to eleven hours.

Working conditions for CRST's drivers are different from those of most other jobs. Drivers spend up to twenty-two hours a day in a tractor with a single coworker. Each two-person team must remain in a small truck cab while the tractor is moving. The cab is a combination driving and living compartment and consists of two front seats and a berth area with two bunk beds. Trips last up to twenty-one days, and drivers usually spend no

time with their families during these trips.  Access to restrooms and showers is limited. Drivers must find truck stops or rest areas, which takes time and thereby impacts the delivery time of the load and the drivers' pay.  Drivers work in distant locations, and supervisors rarely see drivers working together.  Fatality rates show truck driving is the ninth most dangerous occupation in the United States of America.  All told, CRST's drivers share more in common with astronauts, submariners or lighthouse watchmen than they do with the average office worker.

### 2. Front-line personnel

CRST focuses on hiring entry-level drivers, because it can be difficult to find experienced drivers in the labor market.  CRST employs three categories of drivers: "trainees" a/k/a "students," "co-drivers," and "lead drivers" a/k/a "trainers."  All three categories of drivers report to "dispatchers" a/k/a "fleet managers."

#### a. Trainees

Generally, each trainee works with a lead driver for twenty-eight days.  CRST pays trainees a flat rate of approximately $50 a day.  Lead drivers show trainees how to drive CRST's tractors, monitor their progress and evaluate them at the conclusion of the training period.  Lead drivers do not have the authority to hire, fire, promote, demote or reassign trainees; CRST's Safety and Operations Departments make all final decisions with respect to the trainees' employment.  Successful trainees become co-drivers once CRST graduates them.

#### b. Co-drivers

Co-drivers earn a more lucrative "split-mileage rate."  Under the split-mileage rate, each co-driver in a two-member team is paid a certain amount per mile for half of the miles the tractor travels when delivering cargo.  Co-drivers are equal to each other and do not have the authority to hire, fire, promote, demote or reassign one another.

36

### c.     Lead drivers

Co-drivers become lead drivers upon the recommendation of their dispatchers and after safety reviews.  Mr. George Brandmayr, CRST's Lead Driver Program Manager, does not generally interview lead driver candidates and does not actively inquire as to whether lead driver candidates have a history of sexual harassment.

### d.     Dispatchers

Dispatchers generally assign drivers to two-person teams based upon geographical considerations.  For example, dispatchers try to place trainees with lead drivers who reside near them.

Dispatchers generally assign drivers without their input.  It is CRST's policy that lead drivers are not permitted to ask to work with a member of the opposite sex.[11] However, drivers may request a reassignment, and dispatchers make reassignments when necessary.

The reassignment process may be difficult in many circumstances.  Further, dispatchers often have an economic disincentive to grant reassignment requests.  CRST rates its dispatchers on how well they meet production goals; reassignments may adversely affect a dispatcher's "in-service time," that is, the amount of time the trucks she manages are available to move freight.  Changing lead drivers may also delay completion of a driver's training or result in lower pay for co-drivers and lead drivers.

### 3.     Status of women at CRST

CRST employs female trainees, co-drivers, lead drivers and dispatchers.  Even though CRST makes no special efforts to recruit women, approximately 14% of CRST's drivers are female.  Given the availability of women in the relevant labor market, CRST

---

[11] The EEOC presented anecdotal evidence to show that drivers violated this policy. *See, e.g.,* Pl's App'x at 849 (business record noting a driver stated he "WILL TAKE FEMALES ONLY" (emphasis in original)).

employs more than three times as many women as an expert would predict.

CRST has a gender-neutral policy with respect to all of its driver teams: women and men often drive together. In two previous cases against trucking companies that adopted a same-sex team-driver policy, the EEOC investigated, threatened suit and sought punitive damages. Both cases were settled with consent decrees that forbade the companies from maintaining their same-sex team-driver policies.

### 4.   *CRST's policy against sexual harassment*

CRST has adopted an official policy—written and unwritten—against sexual harassment and other forms of unlawful employment discrimination. A portion of CRST's Professional Driver's Handbook ("Driver Handbook") illustrates CRST's policy against sex discrimination. In pertinent part, the Driver Handbook states:

> CRST is committed to providing a work environment that is free of harassment and discrimination. In keeping with this commitment, CRST maintains a strict policy prohibiting harassment or discrimination based on . . . sex . . . . This includes any form of verbal, non-verbal, physical and visual harassment. This policy applies to all employees of CRST, including supervisors and non-supervisory employees.

> Moreover it is the policy of CRST to prevent and prohibit misconduct on the job, including sexual harassment or any other type of harassment or discrimination by co-workers, other employees, including supervisors, and persons doing business with or for [CRST]. **Any employee who reports any act of harassment and/or discrimination will NOT be subject to ANY form of retaliation. All reports of harassment and/or discrimination will be handled in a confidential manner.**

> Any employee found to have acted in violation of the foregoing policies will be subject to appropriate disciplinary action, up to and including termination.

* * *

Employees who are subjected to/or witness harassment or discrimination should immediately report such conduct to any one of the following members of management:

**Immediate Supervisor**
**Director of Human Resources   -       (319) 390-2770**
**           . . . or               -       1-800-366-8460**

[CRST] will take the following steps in addressing complaints of harassment or discrimination in a confidential manner:

1.     Fully inform the employee of his/her avenues to report and redress the harassment pursuant to [CRST's] internal complaint procedure.  Advise the employee that s/he will not be disciplined or otherwise retaliated against as a result of making a complaint.

2.     Immediately conduct a thorough, objective and complete investigation of the alleged harassment and make a determination about whether unlawful harassment has occurred.

3.     Take prompt and effective remedial action commensurate with the severity of the offense of harassment that occurred.

4.     Advise the employee of actions taken to address the complaint.

* * *

**Responsibility of Employees**
*It is the responsibility of all employees to comply with this policy and to report all known violations of this policy to the appropriate supervisor, manager, or Human Resource representative so that corrective action may be taken.*

Def.'s App'x at 145-46 (emphases in original).

CRST requires newly hired drivers to attend a three-and-a-half day orientation.

39

CRST employs "safety trainers" a/k/a "driver trainers" to lead the orientation and provide its drivers sexual harassment training. During the orientation, CRST's safety trainers provide drivers with a copy of the Driver Handbook and explain the company's policy against unlawful sexual harassment and other unlawful employment discrimination. Since early 2008, CRST also has shown its drivers a DVD presentation entitled "CRST Harassment Prevention and Reporting for Drivers."

At the conclusion of the orientation, new drivers acknowledge they have received, read and understood the sexual harassment policy in the Driver Handbook. CRST's written acknowledgment form provides:

> **Acknowledgment and Pledge Concerning Unlawful Harassment and Discrimination**
>
> I ACKNOWLEDGE I have received and read [CRST's] Policy Against Unlawful Harassment and Discrimination. I understand that [CRST] does not tolerate any form of harassment or discrimination at work, including sexual harassment, and any employee who is found to have violated the Policy will be subject to appropriate disciplinary action up to and including termination.
>
> I PLEDGE to conduct myself in accordance with [CRST's] [Policy] and State and Federal Law prohibiting unlawful harassment and discrimination.

Id. at 146-47 (emphases in original).

Safety trainers provide lead drivers a special training, in which CRST reemphasizes its policy against sexual harassment and other forms of unlawful employment discrimination. Since early 2008, lead drivers have watched a special DVD entitled "CRST Harassment Prevention and Reporting for Lead Drivers." Lead drivers also sign acknowledgment forms after completing their special training and watching the DVD.

In 2006, CRST began providing dispatchers with annual sexual harassment training.

Prior to 2006, only operations mangers and mangers above them received annual training on sexual harassment; the only sexual harassment training dispatchers received prior to 2006 was sexual harassment training during orientation and occasional meetings with a member of the Department of Human Resources. In 2007, CRST began providing annual sexual harassment training to safety trainers, safety supervisors and recruiters.

CRST does not provide any annual training about sexual harassment to its drivers. Providing annual sexual harassment training to all drivers would be difficult, because CRST operates over a thousand tractors nationwide and on many different schedules. CRST's "workplaces" are widely dispersed.

For the past several years, however, CRST has hired outside lawyers to give in-house presentations to its employees about sexual harassment prevention. These lawyers educate CRST's managers, including its dispatchers, about sexual harassment so the managers may conduct themselves in a professional manner and identify and report sexual harassment in CRST's workplaces. The lawyers also instruct the managers about how to deal with drivers' complaints of sexual harassment.

CRST displays posters at all company locations that include information about federal equal employment opportunity law and CRST's policy against sex discrimination, including sexual harassment and unlawful retaliation. CRST also displays posters in its truck terminals about "ReportLine," a toll-free phone number employees may call to report unprofessional, illegal and unethical behavior such as sexual harassment. The poster states:

> CRST Companies are committed to operating in a professional, safe and ethical work environment. If you are aware of anything that conflicts with our mission: Talk to your Manager; Talk to Human Resources; Or Call ReportLine. Available 24 Hours/Day, 7 Days/Week. 1-866-207-9076. You do not have to give your name. Remember . . . We're in this for the long haul.

*Id*. at 148.

An independently staffed, third-party company has operated ReportLine for the benefit of CRST employees since April of 2007. All personnel-related complaints ReportLine receives are forwarded to CRST's Human Resources Department for review. Employees may make anonymous complaints. Upon receiving a complaint forwarded from ReportLine, CRST's Human Resources Department is responsible for investigating the complaint and notifying the third-party company that CRST has taken action. ReportLine then contacts the employee to apprise her of the status of CRST's investigation. Employees who wish to remain anonymous are given a phone number they may call to receive the same information.

CRST publishes various newsletters, memoranda and other materials that reiterate and reinforce its sexual harassment policies and procedures for the benefit of its employees. For example, CRST Driving Force is an intra-company publication for office employees whose editions discourage employees from engaging in unprofessional, illegal and unethical behavior. CRST's Code of Business Conduct and Ethics states:

> [T]he work environment must be free of any form of discrimination and conduct which may be considered harassing, disruptive or intimidating. Harassment based on sex . . . is strictly prohibited. Any instances of harassment in any form are to be reported immediately to the appropriate Supervisor or the Human Resources Department.

*Id*. at 150.

The Driver Handbook lists sexual harassment as a [d]ischargeable [a]ction[]." *Id*. at 149. It also reiterates that lead drivers and trainees must "comply with all CRST policies against unlawful harassment/sexual harassment and creating a hostile work environment in the workplace." *Id*. at 150.

The Office Employee Handbook ("Office Handbook") is distributed to all office staff, including all fleet managers. It includes CRST's policy against sex discrimination

and other unlawful employment practices.

The <u>Office Handbook</u> also refers to sexual harassment as an offense subject to discipline. The 2007 version of the <u>Office Handbook</u> contains an "Unlawful Discrimination and Harassment (Positive Work Environment) Policy," which provides managers with detailed instructions for responding to complaints of sexual harassment.

### 5.    *Multiple avenues for reporting sexual harassment*

CRST employs trained and experienced professionals within its Human Resources Department. CRST's human resources professionals enforce its policy against sexual harassment and other forms of unlawful employment practices.

Mr. James Barnes, Director of CRST's Human Resources Department, joined CRST in 2005 and oversees all of its sexual harassment investigations. He is ultimately responsible for ensuring that CRST's policies are enforced. He is responsible for deciding what discipline to impose at the conclusion of each investigation. Mr. Barnes has over twenty-three years of experience in human resources, including fifteen years of conducting investigations. He attends one or two EEOC training seminars each year.

Ms. Lisa Oetken f/k/a Lisa Laveck is CRST's Human Resources Generalist. Ms. Oetken has investigated complaints of sexual harassment since 2005. CRST's Human Resources Directors trained Ms. Oetken how to conduct investigations. She also trained at the University of Iowa in employment law. She attends training on sexual harassment policy provided by CRST's outside counsel and various employment law training sessions. Further, she reads periodicals to maintain up-to-date information on sexual harassment policy and procedures.

CRST's human resources professionals have worked together to provide drivers and other employees with multiple channels for reporting sexual harassment. CRST receives complaints of sexual harassment in various ways, including:

• ReportLine.

- CRST's open door policy. CRST encourages all of its employees to approach their supervisors, any employee in the Operations Department or the Safety Departments or any manager about any issues they would like to raise. All employees, including drivers, have the ability to walk freely throughout CRST company buildings to find someone to speak with;

- Toll-free phone numbers for fleet managers. Drivers may call these phone numbers anytime to reach a fleet manager.

- Qualcomm. A Qualcomm is a device on all trucks that allows drivers to communicate directly with fleet managers while the drivers are on the road. Qualcomm messages are similar to emails but are not private; the other driver on the truck may be able to read them. They are also prone to system shut-downs and other delays.

- The Human Resources Department's nationwide toll-free phone number and local toll phone number. These phone numbers are found in the Driver Handbook.

- Evaluation forms. At the conclusion of training, trainees are encouraged to fill out an evaluation form commenting on or complaining about the lead drivers to whom they were assigned.

These multiple avenues for reporting sexual harassment place redundancies into CRST's efforts to root out sexual harassment and other unlawful employment practice in its workplaces. If a prospective complainant does not receive an immediate response from one resource, she may utilize another resource and work her way up CRST's chain of command.

### 6. *Response and discipline*

CRST has put into place a specific protocol for dispatchers and other managers to follow upon receiving a complaint of sexual harassment. CRST informs its dispatchers of their responsibilities during training.

According to the Office Handbook, "[s]upervisors who become aware of any

incidents or alleged incidents of discrimination or harassment must immediately report them to the Human Resources Director." *Id.* at 150. "Supervisors may not try to resolve allegations of such behavior on their own." *Id.* "Any supervisor who fails to report allegations of discrimination or harassment may be subject to discipline, up to and including discharge." *Id.*

The Office Handbook also defines specific procedures for supervisors when handling the complaints of drivers, who are almost always working on the road in remote locations. Namely,

> [t]he driver's responsible [dispatcher] should determine whether the driver wishes to be removed from the situation, and if so, re-assign the driver to a new lead driver or co-driver as the case may be. The [dispatcher] is to work with the Human Resources [D]epartment to arrange for the driver to make a statement of complaint.

*Id.* As a matter of CRST policy, a driver is never re-assigned to drive with a driver whom she claims sexually harassed her.

For example, when a dispatcher receives a call, Qualcomm, or other communication from a driver who alleges that one of her co-workers has sexually harassed her, the dispatcher must first determine whether the driver is safe or needs to be separated from the alleged harasser. One of CRST's relevant policy documents provides:

> The driver's responsible [dispatcher] should determine whether the driver wishes to be removed from the situation, and if so, re-assign the driver to a new lead driver or co-driver as the case may be.

*Id.* at 152. Dispatchers "may not try to resolve allegations of [incidents of discrimination and harassment] on their own." *Id.* at 153.

Under CRST's policy, dispatchers ought not spend time deciding whether the allegations are valid or try to resolve the sexual harassment issue before removing the

complainant from the offending environment.   CRST's policy requires dispatchers to provide an immediate response when approached with an allegation of sexual harassment. CRST does not provide dispatchers with specific training on how to remove complainants from tractors when an allegation of sexual harassment arises.   However, CRST gives its dispatchers the tools and support necessary to provide an immediate response to alleged victims of sexual harassment.   Dispatchers are authorized to arrange for a hotel room for the alleged victim, and for transportation, including a cab, rental car, bus ticket or other transportation, depending on which would separate the alleged victim from the environment as soon as reasonably possible.   Management supports dispatchers' decisions to make these accommodations.

Dispatchers may arrange to move the alleged victim to the nearest safe location or terminal as soon as reasonably practical, even if the alleged victim indicates she feels safe and does not need to be extricated from the situation immediately.   If the alleged victim does not feel safe but does not think she can safely get off her truck, it might be necessary for the dispatcher to "manufacture" a scenario that requires the truck to stop at a terminal or rendevous with another CRST tractor.   Alternatively, if the alleged victim's allegations warrant such action, the dispatcher may recommend that the driver contact the local police to safely recover personal belongings from the truck or to notify them of possible criminal behavior.

Human Resources Department personnel must investigate all reported harassment complaints.   CRST may respond to sexual harassment allegations with a variety of disciplinary actions, including (1) verbal warnings, (2) written warnings, (3) counseling sessions with Human Resources personnel, (4) removal of lead driver certification, (5) restrictions preventing the alleged offender from driving with certain groups of drivers and (6) termination.

CRST often restricts alleged harassers from driving with women for at least six

months.  When a driver is restricted from driving with a woman, a notification stating "No Females" is placed on his "Five Screen."  A Five Screen is a record appearing in the company's computer database.  Dispatchers may view the driver's Five Screen before arranging driver pairs.  The Five Screen thus alerts dispatchers that the driver should not be assigned to drive with women.  CRST's policy is for dispatchers to enter the restriction on the Five Screen so that they are aware of the restriction for the drivers who report to them.  Reinstatement occurs only upon the driver's request and if approved by Mr. Barnes.

### 7.    *Incidence of sexual harassment among CRST's drivers*

From January 1, 2005 through September 8, 2008, CRST employed 2,701 female drivers who were teamed on at least one occasion with at least one male driver.  In the same period, 146 of CRST's female drivers alleged sexual harassment by at least one male driver.  Those 146 female drivers represent 5.4% of the total 2,701 female drivers employed by CRST who were teamed with at least one male driver during the period.

Over the same time period, there were 6,978 female-male driving teams.  The 146 female drivers made a claim of harassment involving 188 of these teams.  Therefore, 2.7% of all female/male teams involve a complaint of sexual harassment.

The 6,978 female/male teams drove a total of 373,841 trips during the January 1, 2005 through September 8, 2008 period.  The 188 teams that include a claim of harassment made 3,121 trips.  Therefore, 0.8% of the total number of trips involved teams in which a complaint of sexual harassment was made.

The 6,978 female/male teams drove a total of 684,581 days.  The teams that include a claim of harassment drove 5,826 days.  Therefore, 0.9% of all days driven involved teams where a complaint of sexual harassment was made.

The 6,978 female/male teams drove a total of 226,445,880 miles.  The teams where a claim of sexual harassment was made represent 1,804,804 miles.  Therefore, 0.8% of all the miles driven were by teams where a complaint of sexual harassment was made.

Although some women testified that they had heard of the sexual harassment of other female drivers by their trainers and co-drivers, no female driver observed the sexual harassment of another female driver. There is no evidence any of CRST's managers sexually harassed drivers. Likewise, there is no evidence anyone sexually harassed CRST female managers. The unwelcome and offensive conduct by co-drivers and lead drivers generally occurred on the road in remote locations, not in CRST's corporate offices.

These cold statistics do not tell the entire story. The 146 female drivers variously suffered physical, mental and/or emotional abuse at the hands of their male co-drivers and lead drivers. Among other things, their coworkers subjected them to (1) sexually charged comments; (2) verbal abuse; (3) pornography; (4) graphic stories about sex, including the rape of a child; (5) propositions for sex; (6) urination;[12] (7) exposed penises; (8) masturbation; (9) offensive touching, including unwanted "brushing up," kissing, hugging and patting; (10) crawling into women's bunks uninvited; (11) physical abuse, including punching, kicking, grabbing, fondling and rape; (12) theft of underwear; (13) threats of reprisal if the women did not accede to their sexual demands, including threats that trainees would not graduate to co-driver status; (14) ordering women off of the truck; (15) tossing their belongings out of the cab; and (16) parking the tractor in isolated or otherwise "bad" areas.

### 8. *CRST's responses to specific situations*

Much less clear is (1) the extent to which the 146 women informed CRST about the sexual harassment they suffered, *e.g.*, the timeliness and breadth of their complaints in relation to the allegedly offensive conduct to which the women were subjected; and (2) CRST's responses to each complaint. The parties have not compiled this evidence in any

---

[12] Although urination is not "clearly sexual in nature" and lacks "explicit sexual overtones," the sight of it may nonetheless form the basis for a hostile work environment sexual harassment claim. *Hall*, 842 F.2d at 1014.

meaningful way for the court.  After reading thousands of pages of deposition testimony and other documents in conjunction with the parties' Local Rule 56 individual statements of material fact,[13] the court is only able to draw the following, mostly general conclusions about CRST's responses to its female drivers' complaints of sexual harassment:

●      CRST investigated at least 172 complaints of sexual harassment between January 1, 2005 and October 15, 2008.  The vast majority of CRST's investigations did not result in any determination on the part of the Human Resources Department as to whether sexual harassment actually occurred.  When deciding whether sexual harassment allegations were true, CRST was often faced with the classic "he said/she said" situation.

●      At least one male driver was fired after he admitted to sexually harassing a female coworker.  Further, CRST barred dozens of other male drivers from driving with women. This "no females designation" did not alter the male drivers' rates of pay.  On occasion CRST inadvertently allowed a driver with "no females designation" to drive with women.

●      In many instances CRST's dispatchers responded to female drivers' complaints of sexual harassment with compassion and in compliance with CRST's policy against sexual harassment.  Dispatchers offered and/or made arrangements to extricate drivers from their tractors and harassers as soon as possible.  Dispatchers offered to pay or paid for expenses such as travel, lodging and medical care after extrication.  Dispatchers reassigned female drivers to new trainers or co-drivers.  Many of the women who testified in this case did not fault CRST or its dispatchers for the handling of their complaints of sexual harassment.

●      Some female drivers opted to remain in their tractors with their harassers while CRST tried to help them.  These female drivers apparently prioritized their finances over possible further exposure to sexual harassment; under the split-mileage rate and CRST's other policies, all drivers had a financial incentive to remain on their tractors and keep

----

[13] For example, the EEOC's appendix is over 1,300 pages long.  Many of the pages contain four "scrunched" deposition pages.

them moving.  Rather than extricate complainants from their tractors as soon as possible, some dispatchers agreed to re-route the female drivers' tractors or to make other appropriate, delayed arrangements so long as the female driver was willing and not in imminent physical danger.

- Some of CRST's dispatchers and other managers violated CRST's policy against sexual harassment.  For example, some dispatchers occasionally failed to report complaints of sexual harassment to the Human Resources Department.  They tried to remedy situations themselves or, out of laziness or negligence, shifted the burden to the complainant to pursue the matter with higher-level management.  Conversely, CRST's Human Resources Department often failed to communicate with complainants about the status of their sexual harassment complaints and whether CRST imposed discipline upon the accused.

- On occasion CRST's dispatchers failed to protect female drivers from sexual harassment.  The court cannot detect any pattern to the dispatchers' failings; the circumstances surrounding each case vary widely.  Some dispatchers were lazy and "punted" the complainants to other dispatchers.  Some dispatchers did not believe some of the allegations of sexual harassment and for this reason failed to make appropriate arrangements to extricate the women from their tractors.  (At times skepticism filtered up into the Human Resources Department; when one woman told Mr. Barnes and Ms. Oetken that a male driver raped her, Mr. Barnes rolled his eyes and asked rhetorically: "So how much is this going to cost?"  Pl. App'x at 377.)  Other times dispatchers encouraged complainants to tolerate the harassment until they delivered their cargo at its intended destination.  Sometimes dispatchers pointed out (1) it might take CRST longer to reassign the alleged harasser than it would for the team to deliver the cargo; (2)  drivers are not paid while waiting for reassignments; and (3) drivers who leave their tractors without permission from CRST are subject to termination for "abandonment."  On rare occasions

dispatchers affirmatively thwarted the female drivers' complaints of sexual harassment. For example, one female driver told her dispatcher that her co-driver forced her to perform oral sex on him.  The dispatcher, a friend of the co-driver, failed to respond to her complaint.  Another dispatcher betrayed a female driver and informed her harasser of her complaint.

●      CRST does not keep track of drivers' complaints about dispatchers failing to respond appropriately to sexual harassment complaints.  CRST has never fired a dispatcher for mishandling a driver's complaint of sexual harassment.

### D.  Arguments

#### 1.  Motion

In the Motion, CRST asks the court to dismiss the EEOC's "pattern or practice claim."  CRST contends that the EEOC has not met its burden under Federal Rule of Civil Procedure 56 and *Celotex* to present sufficient evidence in support of such claim. Specifically, CRST posits a reasonably jury could not find "(1) that CRST's everyday workplace is permeated with sexual harassment so severe or pervasive that it alters the terms of employment of its female drivers; or (2) that CRST's management has a policy of tolerating an atmosphere of severe or pervasive sexual harassment throughout the workplace."  Def.'s Br. at 4.  CRST proceeds on the assumption that lead drivers are co-workers, not supervisors.

As a threshold matter, CRST points out that the EEOC "elected to offer no affirmative expert evidence, statistical or otherwise, in support of its claims" and thus "attempt[s] to meet its imposing affirmative burden by citing what it contends are 'too many' complaints of sexual harassment by CRST's female drivers without putting any of its evidence into a statistically meaningful context."  *Id.* at 5.  CRST contends that the EEOC only "offer[s] episodic evidence contending that CRST management should be doing a better job of preventing sexual harassment complaints, investigating them,

disciplining offenders, helping alleged victims, training drivers about sexual harassment, and following its own policies and procedures." *Id.* In other words,

> instead of providing evidence of a discriminatory corporate policy or intentionally discriminatory decisions by CRST's officers and directors, [the] EEOC rests its case against CRST on *ad hoc* individual claims that amount to neither a pattern nor a practice. An intentional company-wide policy tolerating all pervasive sexual harassment cannot justifiably be inferred simply from the number of individual claims that [the] EEOC is pursuing in this case.

*Id.* at 11. To rebut this "episodic evidence," *id.* at 5, CRST points the court to its own expert evidence (set forth in Part IV.B.7 *supra*), which establishes that the incidence of sexual harassment complaints among CRST's female drivers is very low—regardless of whether such complaints are viewed in relation to the total number of female employees, the total number of male-female driver teams, the total number of trips taken or the total number of miles traveled.

CRST stresses that it is undisputed that it has a longstanding, official policy against sexual harassment. CRST actively enforces this policy. CRST points to its repeated and myriad efforts to train its employees that sexual harassment is wrong and that CRST does not tolerate it. CRST also points out that it provides its employees with many different avenues to report sexual harassment. Each CRST administrator and manager has testified that CRST does not tolerate sexual harassment in the workplace and affirmatively seeks to root it out. While CRST does not dispute that the EEOC may have presented evidence of isolated individual incidents of sexual harassment and uncovered some of the failings of its policies and procedures, the EEOC has not shown, in the words of the Supreme Court, that it is CRST's "standard operating procedure" to tolerate the sexual harassment of its female drivers. *Teamsters*, 431 U.S. at 336). CRST accuses the EEOC of doing little more than "second guessing CRST's existing policy and enforcement procedures

against sexual harassment." Def.'s Br. at 5.

CRST points out that, unlike every other case in which a court found sufficient facts for a jury to infer an employer had a pattern or practice of unlawful employment discrimination, in this case there is comparatively little evidence—statistical or otherwise—of unlawful discrimination. The incidence of unlawful discrimination pales in comparison to other cases; in *Teamsters*, for example, the United States presented stunning evidence that the defendant-company employed virtually *no* members of certain races in preferred jobs. The company's inability to rebut the inference of discrimination resulted from "'the inexorable zero.'" *Teamsters*, 431 U.S. at 342 n.23 (citation omitted).

CRST stresses that its "workplace" is widely dispersed. CRST argues this fact is a special consideration for the court in deciding whether CRST has engaged in a pattern or practice of tolerating sexual harassment. CRST argues:

> Here, the workplace is not a single facility in which many women employees may be subjected to harassment by the same group of male employees in the same manner for an indefinite period. Instead, CRST's operations involve two-person teams driving trucks far removed from management's ability to observe or control interpersonal conduct. CRST cannot learn or act upon a complaint of sexual harassment from a female driver unless and until she first reports it.

*Id.* at 12-13. CRST contends that this case is "closest" to *EEOC v. Carrols Corp.*, No. 5:98-CV-1772, 2005 WL 928634 (N.D.N.Y. Apr. 20, 2005) (dismissing pattern or practice claim against employer where alleged harassment occurred at 206 different Burger King restaurants) and factually distinguishable from other cases involving allegations of unified workplaces with widespread, pervasive sexual harassment of which the employer must have been aware, including *Jenson*, *Mitsubishi* and *Dial*.

## 2.     *Resistance*

The EEOC resists the Motion in its entirety. The EEOC alleges that, "[s]ince at

least 1997, CRST has tolerated a pattern or practice of sexual harassment of its female truck drivers." Brief in Support of Resistance ("Pl.'s Br.") (docket no. 168-1), at 4. In response to a pending motion the EEOC adopts an even wider view; proceeding on the premise that there is no statute of limitations for "pattern or practice claims" (under either §§ 706 or 707), the EEOC promises at trial "to show that the pattern or practice which existed between January 1, 2005 and the present extended back indefinitely." Lim. Br. at 6. The EEOC apparently intends to seek relief for women sexually harassed as early as 1997 and who have not worked at the company for over ten years. *See id.* ("EEOC has always told CRST that it intends to prove the pattern for a period as far back as the evidence warrants.").

The EEOC accuses CRST of "treat[ing] sex harassment as nothing more than a distraction from the business of moving freight." Pl. Br. at 6. The EEOC recounts female drivers' individual accounts of sexual harassment over the years. Characterizing lead drivers as the trainees' "supervisors" for purposes of Title VII, the EEOC concludes that "CRST is vicariously liable for sexual harassment perpetrated by its trainers, subject to an affirmative defense in cases where the harassment did not culminate in tangible employment action[.]" *Id.* at 10 (referencing *Faragher-Ellerth* doctrine).

The EEOC dismisses CRST's criticism that it has not presented expert testimony or sophisticated statistical evidence to show a pattern or practice of sexual harassment at CRST. The EEOC opines that "[i]t is not essential that a pattern or practice be supported by statistical proof[.]" *Id.* at 12. In any event, the EEOC states that simple math (a numeral tally of the evidence of incidence of complaints of harassment) shows that "[t]he undisputed evidence demonstrates that a minimum of *254* women, or *9.4 percent* of all of CRST's female drivers, have complained of sexual harassment by their trainers or co-drivers" and "the harassment they experienced was severe or pervasive." *Id.* (emphasis in original).

The EEOC criticizes CRST's sexual harassment policy as deficient. Although the EEOC falls short of calling the policy a ruse to hide discrimination, it argues:

> CRST has not changed its policy of sex harassment for drivers for many years. . . . . [T]he policy itself is evidence of CRST's neglect. It does not identify most of the often-repeated behaviors that violate it, including trainers seeking sex in exchange for a passing grade, men assaulting women, men urinating into containers in view of women, men exposing themselves to women, and masturbation. It does not give women the name of a person to contact for complaints. It does not say what to do when a woman is unable to complain because of the known roadblocks to reporting: fear of the trainer or co-driver, lack of Qualcomm training, lack of a cell phone, or off-hours unavailability of CRST personnel. It does not state who the woman's "supervisor" is, or state that the trainer is not her supervisor. It does not say whether and when a woman may be removed from the truck if she is uncomfortable due to a sexual advance or other sexual misconduct. And it does not say to anyone—trainers, trainees, or fleet managers—that sexual harassment should "never happen[.]"

*Id.* at 18-19 (citations omitted).

The EEOC also calls into question CRST's sexual harassment training. The EEOC opines that CRST's trainings are too brief, not presented seriously and not repeated enough. The EEOC points out that drivers do not receive annual sexual harassment training after their orientations, and CRST only introduced annual training for managers in the last few years.

The EEOC contends that CRST fails to protect its female drivers, as its supervisors' failures to follow the policy on all occasions attests. The EEOC also points out that nearly all of CRST's investigations result in no factual finding as to whether sexual harassment in fact occurred. Further, CRST "does not impose any meaningful discipline on those accused of sexual harassment." *Id.* at 23. The EEOC points out that, "[o]f the 157

55

complaints of sexual harassment made by women . . . only 69, or 44%, resulted in a designation of [sic] that the male harasser should not drive with women in the future." *Id*. The EEOC concludes that CRST has a "nod/wink effort at discipline [that] sends a message to harassers that they may freely harass and are likely to get away with it, given the intrinsically coercive atmosphere on the truck, and even if it is reported, they lose nothing." *Id*. The EEOC notes that CRST does not actively monitor its "no females" designation and contends the firing of only one male driver for sexual harassment over the years "shows that it is nearly impossible to get fired for sex harassment." *Id*. at 23-24. The EEOC concludes that CRST is aware that harassment is routine but does not take action to decrease its incidence.

At bottom, the EEOC alleges CRST tolerates sexual harassment for profit. The EEOC summarizes its argument as follows:

> CRST knows that its female drivers are sexually assaulted, propositioned, groped, and exposed to masturbation with frightening frequency and regularity. It has not taken action to decrease the frequency by working to prevent their occurrence or by disciplining the perpetrators. Instead, it concludes that its sexual harassment policy is successful because so many women follow the company's complaint procedure and make complaints of sexual harassment. In other words, CRST's policy works *because so many women are being sexually harassed*. The result of CRST's failure to recognize that a large number of complaints indicates that it has a sexual harassment problem is predictable and widespread. Nearly one out of every ten female drivers who gets on a truck with a male driver at CRST will complain of being sexually harassed. Whether that is sufficient to declare CRST's policy and practice a pattern or practice of discrimination under Title VII should be for the finder of fact to determine.

*Id*. at 26-27 (emphasis in original).

### *3.     Reply*

In its Reply, CRST repeats many of the arguments in its Motion.  Among other things, CRST also accuses the EEOC of (1) grossly distorting the evidence before the court by misstating the deposition testimony of a small number of class members; (2) inappropriately relying on the complaints of the 99 "class members" whom it failed to produce for deposition to inflate the incidence of harassment; (3) nitpicking and quibbling with alleged deficiencies in its sexual harassment policies and procedures without citing any legal authority therefor; and (4) attempting to micro-manage its business.

### *E.  Analysis*

For the reasons set forth in CRST's Motion and Reply, the court holds that the EEOC has presented insufficient evidence to show that CRST has engaged in a pattern or practice of tolerating sexual harassment of its female drivers.  Based upon the record presently before the court, a reasonable jury could not find that it is CRST's "standard operating procedure" to tolerate sexual harassment.  *Teamsters*, 431 U.S. at 336.  To be certain, the EEOC has presented the court with anecdotal evidence that some of CRST's managers occasionally failed to deal appropriately with female drivers' complaints of sexual harassment over the years.   While this may subject CRST to liability as to individual women at trial, the EEOC has not presented sufficient evidence to show that tolerating sexual harassment was "the regular rather than the unusual practice" at CRST. *Id.*  The EEOC is not entitled to *Jenson II*'s modified burden-shifting framework.

It is undisputed that tolerating sexual harassment is not CRST's official policy.  To the contrary, at all relevant times CRST has had a facially valid anti-sexual harassment policy, which it distributed to its employees.   "Distribution of a valid [anti-sexual harassment policy] provides compelling . . . proof of preventing sexual harassment." *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1145 (8th Cir. 2007). Further, CRST ensured its employees received specific training on its anti-sexual

harassment policy. *See id.* (characterizing as "most important[]" the fact an employee "received training specifically about [an anti-sexual harassment] policy"). CRST's anti-sexual harassment policy makes clear that sexual harassment will not be tolerated in CRST's workplaces. Further, it is specific and detailed and provides potential complainants with multiple avenues to report sexual harassment. All of these undisputed facts weigh against a finding that it is CRST's standard operating procedure to tolerate sexual harassment of its female drivers. *See, e.g., id.*; *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811-12 (7th Cir. 1999) (lauding an employer's anti-sexual harassment policy, which "made clear [the employer's] stand that sexual harassment will not be tolerated, . . . provided for multiple mechanisms for the prompt resolution of complaints" and was "both specific and detailed").

The EEOC's criticisms of CRST's anti-sexual harassment policy are not well-taken. The EEOC devotes nearly eight pages of its Resistance to nitpick various aspects of CRST's anti-sexual harassment policy and practices. For example, the EEOC faults one written version of CRST's policy because it fails to state with specificity that "seeking sex in exchange for a passing grade" and "men exposing themselves to women" constitute sexual harassment. The problem with the EEOC's argument—apart from the fact that it should be obvious to any reasonable person that "seeking sex in exchange for a passing grade" and "men exposing themselves to women" constitute sexual harassment—is that the EEOC does not cite a *single case, statute or other legal authority* in any of the eight pages of argument. To show a pattern or practice of unlawful employment practices, the EEOC must do more than quibble with alleged deficiencies in CRST's anti-sexual harassment policy and practices. It must cite legal authority.

The incidence of sexual harassment against CRST's female drivers—no more than 5.4% of the total 2,701 female drivers employed by CRST who were teamed with at least one male driver during the relevant period, 2.7% of all female/male teams, 0.8% of the

trips taken, 0.9% of all days driven or 0.8% of all the miles driven[14]—is not so high as to lead to a reasonable inference that CRST's anti-sexual harassment policies and practices are a ruse to hide a pattern or practice of tolerating sexual harassment.   There is insufficient admissible evidence in the record for a reasonable jury to find it was standard operating procedure at CRST to tolerate sexual harassment.   *Joens*, 354 F.3d at 940 (quoting *Dhyne*, 184 F.3d at 987).   The incidence of unlawful employment activity is a far cry from *Teamsters* and its "inexorable zero."   431 U.S. at 342 n.23 (citation omitted).

The EEOC has not presented the court with any expert evidence, statistics or legal authority to support its argument that there is so much sexual harassment of CRST's female drivers that CRST must tolerate sexual harassment.   Surprisingly, the EEOC has not offered any of its own statistical or expert evidence in this case; the Supreme Court and the various circuit courts of appeals have long recognized that such evidence is usually an important component of proof in a pattern or practice case.   *See, e.g., Teamsters*, 431 U.S. at 339 ("[O]ur cases make it unmistakably clear that '[s]tatistical analyses have served and will continue to serve an important role' in cases in which the existence of discrimination is a disputed issue." (Citations omitted.)); *Catlett*, 828 F.2d at 1266 (reiterating that statistical evidence was important because it "serve[d] to reinforce the suggestion that these discriminatory incidents were not isolated or sporadic but were representative of Missouri's standard operating procedure"); *Craik*, 731 F.2d at 470

---

[14] These are conservative estimates made in the EEOC's favor.   The percentages set forth in Part IV.C.7 *supra* will decrease (1) if the court or the jury later determines that some of the women who have testified in this case did not experience severe or pervasive sexual harassment or (2) if the court adopts the EEOC's contention that § 706 lacks a statue of limitations and the pattern or practice began in 1997 instead of 2005.   *Cf. Craik*, 731 F.2d at 481 (affirming district court's finding that class-wide sexual harassment did not exist when plaintiffs proved "about 50 incidents which occurred over a ten-year period").   The court notes that the court in *Carrols* did not make these assumptions in the EEOC's favor but nonetheless granted summary judgment in the defendant-employer's favor.   2005 WL 928634, at *4-*5.

(stating that in pattern or practice cases the plaintiff "[n]ormally" will offer statistical evidence); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) ("[I]n a pattern or practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's 'standard operating procedure.'"); *Jenson II*, 824 F. Supp. 874-88 (relying heavily on plaintiff's expert testimony).

The court does not suggest that statistical evidence is necessary to prove a pattern or practice claim. "Either [statistical or anecdotal evidence recounting specific instances of discrimination] alone may be sufficient to establish a pattern or practice of discrimination." *Catlett*, 828 F.2d at 1265. In *Teamsters*, the Supreme Court further cautioned that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." 431 U.S. at 340. There may yet be truth in Mark Twain's observation that "[t]here are three kinds of lies: lies, damned lies, and statistics"; the problem is that the EEOC has not given the court any evidence to disprove CRST's statistical evidence. But the EEOC may not turn Rule 56 and *Celotex* on their heads and simply piggyback on CRST's evidence.[15] In this regard the EEOC's argument boils down to little more than its bald assertions that CRST's business model is "intrinsically coercive" and the incidence of sexual harassment among CRST's female drivers is shockingly high. Yet attorney argument is not evidence, *Exeter Bancorp., Inc. v. Kemper Secs. Group, Inc.*, 58 F.3d 1306, 1312 n. 5 (8th Cir. 1995) (reiterating that statements of counsel are not evidence and will not carry the day on a motion), and "[e]vidence, not contentions, avoids summary judgment." *Reasonover*, 447 F.3d at 578.

It is important to remember that CRST's lead drivers were the trainees' coworkers,

---

[15] Making matters worse, the EEOC attempts to inflate CRST's own evidence by asking the court to consider inadmissible complaints of sexual harassment.

not their supervisors.  It is true the EEOC presented anecdotal evidence to show CRST almost exclusively relied upon the observations of lead drivers when deciding whether to promote trainees to co-driver status.  For example, Mr. Barnes informally characterized the relationship between lead drivers and trainees during EEOC administrative proceedings as "really no different than the role of supervisors in other industries and organizations." Pl.'s App'x at 831.  The EEOC also presented anecdotal evidence to show some trainees believed their lead drivers possessed supervisory status.  Notwithstanding such anecdotal evidence, it is undisputed that—in fact—final authority to hire, fire, promote, demote or reassign trainees did not rest with lead drivers.  Absent proof such authority rested with lead drivers, lead drivers are not "supervisors" for purposes of Title VII.  *See Merritt v. Albermarle Corp.*, 496 F.3d 880, 883-84 (8th Cir. 2007) ("[T]o be considered a supervisor, the alleged harasser must have had the power . . . to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties." (Citation omitted.)).  Indeed, the Eighth Circuit Court of Appeals explicitly rejected the EEOC's broad interpretation of supervisory status in a similar case.  *See, e.g., Weyers v. Lear Operations Corp.*, 359 F.3d 1049, 1056-57 (8th Cir. 2004) (holding that a "team leader" with the authority "to assign employees to particular tasks" was not a supervisor and specifically rejecting the EEOC's broader interpretation of supervisory status).  The Eighth Circuit Court of Appeals has also indicated that "apparent authority would be an insufficient basis to support a finding of supervisor status." *Id*. at 1057 n.7 (citing *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 598 (8th Cir. 1999)).  The court may not hold CRST strictly liable for the conduct of its lead drivers or co-drivers.

The EEOC has presented the court with anecdotal evidence to show that some members of CRST's management occasionally violated CRST's anti-sexual harassment policy by failing to respond appropriately to sexual harassment in the workplace.  (Those

facts are set forth in Part IV.C *supra* and need not be repeated here.)  However, the EEOC has not compiled the failings of CRST's managers in any meaningful way to show that CRST has a pattern or practice of tolerating sexual harassment in its workplace.   Absent such initiative on the part of the EEOC, there is nothing in the record which a reasonable jury might cobble together to show these failures were part of a *pattern or a practice* of tolerating sexual harassment instead of merely isolated or sporadic failures over the course of four (or perhaps twelve) years.

This case is manifestly unlike *Jenson II*.  Apart from the EEOC's failure to present expert statistical evidence of, for example, "sex stereotyping" and its failure to compile the evidence in a meaningful fashion for the court, there is simply no evidence in the record that men occupied virtually every supervisory and managerial position and created a "sexualized environment" for their female subordinates.  824 F. Supp. at 885.  There is no evidence women worked in a largely unified work environment in which "[v]irtually all of the relevant testimony and evidence indicates that male employees, [including first-line supervisors,] felt free to and did exhibit sexually-focused material anywhere they chose."  *Id.* at 880.  There is no evidence CRST failed to establish a system for processing sexual harassment complaints.   CRST assigned members of its management the responsibility to curtail sexual harassment in the workplace and has made repeated efforts to communicate with its employees that sexual harassment is wrong.

The EEOC excoriates CRST's Human Resources Department for failing to make formal findings of fact and, based upon such findings, discipline harassers.  The EEOC's argument ignores reality and settled Eighth Circuit Court of Appeals case law.   The EEOC's argument ignores reality by confusing CRST with a court or some other body empowered by law to make such findings.  Unlike a court or administrative organization such as the EEOC, CRST's Human Resources Department does not  possess the power to compel sworn testimony under penalty of perjury.  It should come as no surprise to the

EEOC, then, that CRST's investigations do not always produce sufficient information upon which to base a decision as important as deciding whether an employee should be fired for misconduct. Many adjudicative bodies, including the EEOC, who possess such powers are themselves unable to reach conclusions of ultimate fact in every case.

The EEOC's argument ignores settled Eighth Circuit Court of Appeals case law. "[T]here is no 'requirement that the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser.'" *Adams*, 538 F.3d at 930 (citation omitted)). While the court must assume all of the female drivers' allegations to be true for purposes of Rule 56, it does not follow that CRST's dispatchers or other managers were required to have done the same if and when those women reported their allegations in accordance with CRST's anti-sexual harassment policy. Because of the relatively unique nature of CRST's "workplace," nearly every complaint of sexual harassment creates the classic "he said/she said" situation. Even if CRST's Human Resources Department were a court or other adjudicative body, justice is due to the accuser *and* the accused. *Snyder v. Massachusetts*, 291 U.S. 97, 122 (1934) (Cardozo, J.). As it is, it appears to be CRST's policy and usual practice to bar alleged harassers from driving with women without making formal factual findings.

Of the reported pattern or practice cases decided at the summary judgment stage, this case is most similar to *EEOC v. Carrols Corporation*, No. 5:98-CV-1772, 2005 WL 928634 (N.D.N.Y. Apr. 20, 2005). In *Carrols*, The EEOC brought a pattern or practice hostile work environment sexual harassment case[16] against an employer who also had a widely dispersed "workplace"—the employer owned and operated 350 Burger King restaurants in sixteen states. 2005 WL 928634, at * 1. The district court set forth the following criteria for determining whether it was the employer's "standard operating procedure" to tolerate sexual harassment:

---

[16] The court notes that in *Carrols* the EEOC filed suit under both §§ 706 *and* 707.

> Neither statute nor case law provides a definitive list of the relevant circumstances that a court should consider. However, in a particular case, the nature of the plaintiff's offered proof and the nature of the defendant's business operations will indicate that certain criteria are relevant.
>
> * * *
>
> [Here,] the Court must compare the number of allegations to the total number of Defendants' female employees during the relevant period. The Court must also consider the number of years over which the allegations arose. Furthermore, the Court must examine certain aspects of the allegations and Defendant's workplace that are relevant to the issue of how the alleged conduct would affect the reasonable woman, e.g. whether the alleged harasser was a supervisory employee, whether the alleged harasser was likely to remain in Defendant's employ for a significant period of time, and whether the alleged victim was aware of conditions in Defendant's restaurants outside of the one in which she worked.

*Id.* at *2.

The district court then applied these criteria to the facts before it in the summary judgment record. First, turning to the facts, the district court held that, at most, a reasonable jury could find 333 of 90,835 employees at a total of 206 distinct restaurants had suffered sexual harassment. *Id.* at *4. This amounted to .367% of the women the defendant had employed during such time-frame. *Id.* Second, the district court found that the harassment occurred over an eight-year period. Third, the district court pointed out that the employer had high turnover and most of its female employees did not work at more than one restaurant. *Id.* As a consequence, the district court observed:

> Plaintiff . . . argues that a statistical analysis of its submissions is misleading because multiple discrete incidents of sexual harassment may result in a cumulative level of hostility in the work environment greater than that indicated merely by counting the incidents. However, the strength of this argument depends upon whether the alleged victims are aware of the discrete incidents. Certainly a woman who has

never directly been subjected to harassing conduct, but who is aware that other female co-workers have been so subjected, may reasonably regard her work environment as hostile. However, in the instant case, Plaintiff's submission indicate[s] that most of Defendant's female employees did not work at more than one restaurant. Consequently, they knew little of Defendant's policies and practices and the experiences of Defendant's employees beyond what they saw in their individual restaurants. Therefore, the multiplying effect of incidents of sexual harassment is substantially weaker in this case than it is in cases involving more unified work environments and workforces.

*Id.*; *see also Jones v. Flagship Int'l*, 793 F.2d 714, 721 n.7 (5th Cir. 1986) (cited with approval in *Hall*, 842 F.2d at 1015, for the proposition that "incidents of sexual harassment reported by other females bear on plaintiff's claim only if there is evidence that incidents affected plaintiff's psychological well-being")). Fourth, the district court noted that 69 of the alleged incidents of sexual harassment involved non-supervisory employees and another 53 against low-level supervisors. *Id.* Fifth, the district court pointed out that, whereas the EEOC had failed to compile evidence to establish the number of harassers still in the defendant's employ, the defendant had affirmatively presented evidence to show it had fired, suspended or otherwise disciplined dozens of alleged harassers. *Id.* at *5.

The district court rejected the EEOC's argument that statistical evidence in a sexual harassment pattern or practice case was misleading. *Id.* at *4. Although the district court conceded it was unable to "articulate a specific threshold for the number of claims that is necessary to establish a pattern or practice of sexual harassment," the district court pointed out that not "even a substantial minority of Defendant's female employees experience harassment." *Id.* The court district held that the EEOC's evidence "f[e]ll *well short* of what is required" and granted the employer's motion for summary judgment as to the

EEOC's pattern or practice claims of sexual harassment.  *Id.* (emphasis added).[17]

The same analysis applies with equal—if not greater force—here.  The EEOC has presented the court with insufficient evidence to survive summary judgment on its "pattern or practice claim."  While the incidence of sexual harassment is apparently higher here than in *Carrols*, not even a substantial minority of Defendant's female employees experienced harassment.  Further, apparently unlike the Defendant in *Carrols*, this defendant has adopted policies and procedures to forestall harassment.  This is not a case of "systemic, company-wide discrimination" or "an objectively verifiable policy or practice of discrimination by a private employer against its employees."  *Mitsubishi*, 990 F. Supp. at 1070.

In any event, application of the *Teamsters* burden-shifting framework as modified by *Jenson II* would appear to present special difficulties in the instant case.  Burden shifting in pattern and practice cases is justified in large part upon the premise that "[p]resumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof."  *Teamsters*, 431 U.S. at 359.  Here, CRST does not operate a unified workplace.  Its workplaces are largely the cabs of hundreds upon hundreds of semi-truck tractors.  As a consequence, there is little reason to assume all allegedly aggrieved persons were subjected to the same harm, just as a court might presume in the mine-run case with a unified workplace.  *Cf. Teamsters*, 431 U.S. at 360 & n.45 (appearing to recognize that the burden-shifting paradigm might not be appropriate in all pattern or practice cases if the determination at the liability phase did not "create a greater likelihood that any single decision was a component of the overall pattern"); *Craik*, 731 F.2d at 471 n.9 (discussing the theoretical underpinning of the burden of persuasion shift in *Teamsters*).  There is even less reason

---

[17] *Carrols* is still pending before the district court more than a decade after the EEOC filed it.

to assume that CRST is in a superior position to gauge the subjective experience of each female driver than the female driver herself. *Cf. Int'l Profit Assocs.*, 2007 WL 3120069, at *15 ("[E]ach individual claimant should have knowledge of the specific harassment she experienced . . . . [S]hifting the burden . . . does not make sense under *Teamsters*" in a sexual harassment case.)).

Accordingly, the court holds that the EEOC has not established a pattern or practice of tolerating sexual harassment. Therefore, the EEOC will not be permitted to avail itself of the *Jenson II* burden-shifting framework at trial. Nothing in this opinion, however, should be construed as a final ruling on the individual claims of sexual harassment that the EEOC presses in this action. At trial, the EEOC may be able to prove CRST is liable for sexual harassment as to individuals and obtain the equitable and other relief it seeks on their behalf. *Cf. Catlett*, 828 F.2d at 1265 ("[A] class claim may fail despite proof of discrimination against one or more individuals[.]").

## V. CONCLUSION

The Motion (docket no. 150) is **GRANTED**. To the extent that the EEOC asserts a "pattern or practice claim" in this litigation against CRST, such claim is **DISMISSED WITH PREJUDICE**. The EEOC shall pay CRST's ordinary costs. CRST may file its request for costs **10 court days** after the disposition of the entire case.

**IT IS SO ORDERED.**

**DATED** this 30th day of April, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

67