**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

       Plaintiff,

and

JANET BOOT, BARBARA GRANT,
CINDY MOFFETT, REMCEY
JEUNENNE PEEPLES, LATESHA
THOMAS and NICOLE ANN
CINQUEMANO,

Plaintiffs-Interveners,

vs.

CRST VAN EXPEDITED, INC.,

       Defendant.

No. 07-CV-95-LRR

**ORDER**

---

### TABLE OF CONTENTS

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II. RELEVANT PRIOR PROCEEDINGS** . . . . . . . . . . . . . . . . . . . . . . . . **3**
    *A.* *Ms. Starke's Charge* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
    *B.* *The EEOC's Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
    *C.* *Answer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *D.* *First Intervener Complaint* . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
    *E.* *Second Intervener Complaint* . . . . . . . . . . . . . . . . . . . . . . . . **7**
    *F.* *Amended Intervener Complaints* . . . . . . . . . . . . . . . . . . . . . . **8**
    *G.* *Motion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

III.  **SUMMARY OF THE RELEVANT LAW** . . . . . . . . . . . . . . . . . . . . . **9**
      A.    *Unlawful Sex Discrimination—Sexual Harassment* . . . . . . . . . . . . *9*
      B.    *Unlawful Retaliation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*
      C.    *Standard for Summary Judgment* . . . . . . . . . . . . . . . . . . . . . *13*

IV.   **THE MERITS OF THE CLAIMS OF THE PLAINTIFFS-INTERVENERS**    **14**
      A.    *Ms. Boot* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
            1.    *Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *14*
            2.    *Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *16*
            3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *17*
      B.    *Ms. Cinquemano* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*
            1.    *Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *18*
            2.    *Argument* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *23*
            3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *24*
                  a.    *Sexual harassment claims* . . . . . . . . . . . . . . . . . . *24*
                  b.    *Retaliation claims* . . . . . . . . . . . . . . . . . . . . . . *24*
      C.    *Ms. Grant* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*
      D.    *Ms. Peeples* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
            1.    *Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*
            2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *29*
      E.    *Ms. Starke* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *30*
      F.    *Ms. Thomas* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *30*
            1.    *Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *30*
            2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*

V.    **NON-EXTRATERRITORIALITY OF ICRA** . . . . . . . . . . . . . . . . . . . . . **33**
      A.    *Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *33*
      B.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *35*

VI.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

## I.  INTRODUCTION

The matter before the court is Defendant CRST Van Expedited, Inc.'s "Motion for Summary Judgment Against the Claims of Certain of the Interveners" ("Motion") (docket no. 145).

## II. RELEVANT PRIOR PROCEEDINGS[1]

### A. Ms. Starke's Charge

On December 1, 2005, Ms. Monika Starke presented a Charge of Discrimination ("Charge") to Plaintiff Equal Employment Opportunity Commission ("EEOC"). Ms. Starke alleged that her employer, Defendant CRST Van Expedited, Inc. ("CRST"), "discriminated against [her] on the basis of . . . sex . . . , in violation of Title VII of the Civil Rights Act of 1964, [42 U.S.C. § 2000e *et seq.*,] as amended" ("Title VII"). Def.'s App'x at 2998. Ms. Starke alleged the following "particulars" in her Charge:

> I was hired by [CRST] on June 22, 2005 in the position of Truck Driver. Since my employment began with [CRST,] I have been subjected to sexual harassment on two occasions by my Lead Trainers. On July 7, 2005, Bob Smith, Lead Trainer[,] began to make sexual remarks to me whenever he gave me instructions. . . . . On July 14, 2005, I contacted the dispatcher and was told that I could not get off the truck until the next day. On July 18, 2005 through August 3, 2005, David Goodman, Lead Trainer, forced me to have unwanted sex with him on several occasions while we were traveling in order to get a passing grade.

*Id.* Further, Ms. Starke alleged that CRST "did not state why I was subjected to sexual harassment[,] which created a hostile work environment." *Id.*

Ms. Starke asked the EEOC to file her Charge and cross-file it with the Iowa Civil Rights Commission ("ICRC"). Pursuant to a work-sharing agreement,[2] the EEOC received the Charge on behalf of both agencies and deemed the Charge to be "initially instituted" with the ICRC. (In the work-sharing agreement, the EEOC and ICRC

---

[1] The court assumes complete familiarity with the prior proceedings.

[2] For further explanation of the work-sharing agreement between the EEOC and the ICRC, see *Millage v. City of Sioux City*, 258 F. Supp. 2d 976, 985-86 (N.D. Iowa 2003) (Bennett, C.J.).

reciprocally designated each other as agents for receiving charges of unlawful employment practices.) The EEOC sent a copy of the Charge to the ICRC, notified the ICRC that the Charge "is to be initially investigated by the EEOC," *id.* at 3000, and began its investigation. The ICRC had waived its right to exclusive jurisdiction over charges initially instituted with it. Here, the ICRC filed the Charge on December 5, 2005 but apparently stayed its own investigation pending resolution of the EEOC proceedings.

The Charge remained pending before the EEOC for nearly two years. During such time, Ms. Starke did not exercise her right to file a Title VII lawsuit against CRST. *See* 42 U.S.C. § 2000e-5(f)(1) (permitting a charging party to file an individual Title VII lawsuit 180 days after her charge is filed); *see, e.g., Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 366 (1977) (explaining that § 2000e-5(f)(1) provides "[a]n aggrieved person unwilling to await the conclusion of extended EEOC proceedings [the right to] institute a private lawsuit 180 days after a charge has been filed").

### B. The EEOC's Complaint

On September 27, 2007, the EEOC filed the instant lawsuit on behalf of Ms. Starke "and a class of similarly situated female employees of [CRST] . . . ." Complaint (docket no. 2), at 1. Pursuant to 42 U.S.C. § 2000e-5(f)(1) and (3) and 42 U.S.C. § 1981a, the EEOC brings suit in its own name "to correct [CRST's] unlawful employment practices on the basis of sex, and to provide appropriate relief to [Ms.] Starke and a class of similarly situated female employees of [CRST] who were adversely affected by such practices." First Amended Complaint (docket no. 8), at 1.[3] The EEOC generally alleges that Ms. Starke and the other similarly situated women ("aggrieved persons" in Title VII

---

[3]    The First Amended Complaint, filed on November 16, 2007, corrected a typographical error in the Complaint. Ruling (docket no. 31), at 1 n.1.

parlance[4]) "were adversely affected . . . when their lead drivers or team drivers subjected them to sexual harassment and to a sexually hostile working environment based on their gender, and CRST failed to prevent, correct, and protect them . . . ." *Id.* At present, the EEOC seeks monetary and equitable relief on behalf of 142 allegedly aggrieved persons. Notice (docket no. 237), at 1-5.

## C. Answer

On November 30, 2007, CRST filed an Answer and Affirmative Defenses (docket no. 11). On May 1, 2008, CRST filed an Amended Answer and Affirmative Defenses ("Amended Answer") (docket no. 36) to assert an additional affirmative defense. CRST denies the substance of the EEOC's Complaint and asserts seven affirmative defenses, including waiver or release, failure to exhaust administrative remedies and "untimel[iness]." Amended Answer at 2.

## D. First Intervener Complaint

On August 18, 2008, Ms. Starke and five other women, Mss. Janet Boot, Barbara Grant, Cindy Moffett, Remcey Jeunenne Peeples and Latesha Thomas, filed a Motion for Leave to Intervene ("First Motion to Intervene") (docket no. 43). They asked the court for permission to intervene in this lawsuit, pursuant to Federal Rule of Civil Procedure 24 and 42 U.S.C. §§ 2000e-5(f)(1) and 2000e-7. Their proposed Complaint ("First Intervener Complaint") (docket no. 49) is substantially similar to the EEOC's Complaint except for three additions.

First, Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas each plead violations of the Iowa Civil Rights Act ("ICRA"), Iowa Code chapter 216 (2007), in addition to violations of Title VII. Second, they plead retaliation claims in addition to claims of sexual

---

[4] Once again, the court refers to the "similarly situated female employees" who are referenced in the EEOC's Complaint as "allegedly aggrieved persons" and not as "class members." Order (docket no. 223), at 5-6.

harassment, all in violation of Title VII and ICRA. *See, e.g.*, First Intervener Complaint (docket no. 43-3), at 4 ("The retaliation including [sic] among other things, stranding the Plaintiffs/Interveners, giving them unfavorable assignments, and terminating their employment, such that [CRST]'s conduct had a tendency to dissuaded [sic] a reasonable worker from making or supporting a charge of discrimination."). Third, Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas seek attorneys' fees from CRST.

On September 2, 2008, CRST filed a Resistance (docket no. 46) to the First Motion to Intervene. CRST argued the First Motion to Intervene was untimely because it was filed three months after the court's deadline for adding parties or amending the pleadings. In the alternative, CRST argued that the First Intervener Complaint failed to establish the rights of Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas to sue under ICRA. CRST noted the six women had not pled compliance with or exhaustion of ICRA's administrative requirements. CRST also questioned their standing to sue under ICRA, because apparently only Ms. Boot resides in Iowa.

On September 11, 2008, Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas filed a Reply (docket no. 47), to which they attached right-to-sue letters from the ICRC for Mss. Starke, Grant, Moffett, Peeples and Thomas (but not Ms. Boot). All five right-to-sue letters are undated. Each letter states without explanation that the woman under consideration had filed a timely charge with the ICRC. *See* Iowa Code § 216.15(12) ("Except as provided in [§] 614.8, a claim under this chapter shall not be maintained unless a complaint is filed with the commission within three hundred days after the alleged discriminatory or unfair practice occurred."). The right-to-sue letters for Mss. Starke and Peeples state they might file a civil action against CRST within 90 days of August 19, 2008. The right-to-sue letters for Mss. Grant, Moffett and Thomas state they might file a civil action against CRST within 90 days of September 11, 2008.

On September 26, 2008, United States Magistrate Judge Jon S. Scoles granted the

First Motion to Intervene. Judge Scoles construed § 2000e-5(f)(1) to afford Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas the right to intervene in this action. *See* 42 U.S.C. § 2000e-5(f)(1) ("The person or persons aggrieved shall have the right to intervene in a civil action brought by the [EEOC] . . . ."). Judge Scoles held the First Motion to Intervene was timely under Rule 24 even though Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas "did not offer a convincing reason for their delay in attempting to join this action . . . ." Order (docket no. 48), at 5.[5] Judge Scoles pointed out it was unclear from the record whether Mss. Starke, Boot, Grant, Moffett, Peeples and Thomas had established their rights to sue under ICRA. Instead of denying the First Motion to Intervene on grounds of futility, however, Judge Scoles granted the Motion to Intervene and urged CRST to "file an appropriate motion in that regard." *Id.* at 7.

CRST did not appeal Judge Scoles's decision. Rather, on October 20, 2008, CRST filed an Answer (docket no. 50) to the First Intervener Complaint. CRST denied the substance of the First Intervener Complaint and asserted ten affirmative defenses, including the affirmative defenses it advanced in its Amended Answer.

### E. Second Intervener Complaint

On November 26, 2008, Ms. Nicole Cinquemano filed a Motion for Leave to Intervene ("Second Motion to Intervene") (docket no. 76). Ms. Cinquemano's proposed Complaint ("Second Intervener Complaint") (docket no. 83) was nearly identical to the First Intervener Complaint. Ms. Cinquemano alleges sex discrimination and retaliation in violation of Title VII and ICRA. Specifically, Ms. Cinquemano alleges she "was subjected to . . . unwelcome sexual conduct, other unwelcome physical touching, propositions for sex, and sexual comments from her lead driver" and was "threatened with

---

[5] Judge Scoles later noted that Ms. Starke's attorneys, who also represent Mss. Boot, Grant, Moffett, Peeples and Thomas, "apparently [had] monitored the litigation from the outset." Order (docket no. 124), at 3 n.2.

losing her license, and ultimately losing her job, such that [CRST]'s conduct had a tendency to dissuade a reasonable worker from making or supporting a charge of discrimination." Second Intervener Complaint at 3. Ms. Cinquemano asserted the Second Motion to Intervene was timely "[b]ecause [CRST]'s unlawful employment practices continues [sic] until just a few months ago with respect to Ms. Cinquemano, and because a right to sue letter was just obtained . . . ." Brief in Support of Second Motion to Intervene (docket no. 76-2), at 1. Ms. Cinquemano pointed out she had been "an identified class member for some time, and allowing her to intervene [would] in no way unfairly prejudice [CRST]." *Id.* at 2.

On December 4, 2008, CRST filed a Resistance (docket no. 81) to the Second Motion to Intervene. CRST reasserted the arguments in its resistance to the First Motion to Intervene. Further, CRST pointed out Ms. Cinquemano filed the Second Motion to Intervene "just six weeks before the January 15, 2009 discovery cut-off date and without any justification for this last-minute attempt to intervene." Resistance (docket no. 81), at 1.

On December 8, 2008, Judge Scoles granted the Second Motion to Intervene "[f]or the reasons stated by the Court in its earlier [Order (docket no. 48)]." Order (docket no. 82), at 1. Again, CRST did not appeal Judge Scoles's decision to the undersigned. On January 9, 2009, CRST filed an Answer (docket no. 105) to the Second Intervener Complaint, in which it denies the substance of the Second Intervener Complaint and advances ten affirmative defenses, including the affirmative defenses it advances in its Amended Answer.

### F. Amended Intervener Complaints

On May 22, 2009, Ms. Cinquemano filed an Amended Complaint (docket no. 240). On the same date, Mss. Boot, Grant, Moffett, Peeples and Thomas filed an Amended Complaint (docket no. 241). These amended pleadings reflect that, on May 14, 2009, the

EEOC issued right-to-sue letters to Mss. Cinquemano, Grant, Moffett and Thomas (but not Ms. Boot or Ms. Starke).[6]

## G. Motion

On February 13, 2009, CRST filed the Motion. On March 16, 2009, Plaintiffs-Interveners Janet Boot, Barbara Grant, Cindy Moffett, Remcey Jeunenne Peeples, Monika Starke, Latesha Thomas and Nicole Ann Cinquemano (collectively, "Plaintiffs-Interveners") filed a Resistance (docket no. 161). On March 31, 2009, CRST filed a Reply (docket nos. 181 & 182). The EEOC did not respond to the Motion, even though it claims an attorney-client relationship with Plaintiffs-Interveners and intends to seek relief on their behalf at trial (to the extent that the court has not already barred it from doing so).

CRST requests oral argument on the Motion, but the court finds oral argument is not appropriate. *See* LR 7.c. The Motion is fully submitted and ready for decision.

## III. SUMMARY OF THE RELEVANT LAW

### A. Unlawful Sex Discrimination—Sexual Harassment

Under Title VII and ICRA, it is generally unlawful for an employer to discriminate against a woman because of her sex. 42 U.S.C. § 2000e-2(a)(1); Iowa Code § 216.6(1)(a). It is settled that sexual harassment in the form of a hostile work environment may constitute unlawful sex discrimination under either statute. *See, e.g., Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (Title VII); *Reed v. Cedar County*, 474 F. Supp. 2d 1045, 1061 (N.D. Iowa 2007) (Title VII and ICRA).[7]

---

[6] The EEOC issued the right-to-sue letters less than a month before trial is scheduled to commence. At present, the significance of the right-to-sue letters is unclear.

[7] The court collapses the Title VII and ICRA analyses in the instant Order. *See Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1147 (8th Cir. 2008) ("In most respects, Iowa courts have used the analytical framework used for Title VII claims, and have looked to federal law for guidance, in deciding cases under the ICRA because the ICRA is modeled in part on Title VII."); *see, e.g., Farmland Foods, Inc. v. Dbq. Human Rights*

To prove sex discrimination based upon a hostile work environment theory of sexual harassment, a plaintiff must prove "(1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194-95 (8th Cir. 2006) (citing *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005)). In addition,

> if the harassment was committed by a co-worker, [a plaintiff] must . . . establish that [the employer] "knew or should have known of the conduct and failed to take proper remedial action." *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 987 (8th Cir. 1999). On the other hand, if the harassment was committed by an employee who supervised [the plaintiff], [the employer] is vicariously liable for the harassment unless it can establish the affirmative defense defined in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998).

*Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004). That is,

> [the employer] is vicariously liable for harassment by its supervisory personnel unless it can establish that (1) [it] exercised reasonable care to prevent and promptly correct any harassing behavior; and (2) [the plaintiff] unreasonably failed to take advantage of the preventive or corrective opportunities provided by [the employer]. [*Ellerth*, 524 U.S. at 765]. An employer may assert the affirmative defense only "[w]hen no tangible employment action is taken." [*Faragher*, 524 U.S. at 807-08].

---

*Comm'n*, 672 N.W.2d 733, 743-45 & n.2 (Iowa 2003) (adopting the Title VII framework for hostile work environment racial discrimination claims brought under ICRA). Although the Iowa Supreme Court repeatedly has indicated that the Title VII and ICRA analyses may diverge, *see, e.g., McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005), neither party argues for divergent analyses in this case.

*Gordon*, 469 F.3d at 1195.

To prove sexual harassment is sufficiently unwelcome to be actionable under Title VII or ICRA, a plaintiff must meet an objective standard and a subjective standard. With respect to the objective standard, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[W]hether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances," including the frequency, physicality and severity of the conduct. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (per curiam) (citations and internal quotation marks omitted). With respect to the subjective standard, it is settled that, "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no [sex discrimination]." *Harris*, 510 U.S. at 21-22.

It is important to remember that neither Title VII nor ICRA "mandate[s] an employment environment worthy of a Victorian salon." *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1017 (8th Cir. 1988). "White gloves, crystal, and fine china are neither required nor expected." *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 662 (D. Minn. 1991). Title VII and ICRA were not designed to "displace all ribaldry on the roadway," and "[o]ne may well expect that . . . language of the barracks will always predominate over that of the ballroom." *Hall*, 842 F.2d at 1017-18.

### B. Unlawful Retaliation

In addition to proscribing sexual harassment in the workplace, Title VII and ICRA prohibit retaliation against employees who allege—or participate in an investigation or proceeding alleging—a violation of Title VII or ICRA by their employers. Title VII makes it unlawful for an employer to discriminate against an employee for "oppos[ing] any

11

practice made unlawful by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). ICRA makes it illegal for an employer "to discriminate or retaliate against another person in any of the rights protected [under ICRA] because such person has lawfully opposed any practice forbidden under [ICRA], obeys [ICRA], or has filed a complaint, testified, or assisted in any proceeding under [ICRA]." Iowa Code § 216.11.

Absent direct evidence of retaliation, a plaintiff's claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barker v. Mo. Dep't of Corrs.*, 513 F.3d 831, 834 (8th Cir. 2008); *see also Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) ("An employee can prove retaliation through circumstantial evidence using the *McDonnell Douglas* burden-shifting analysis." (Citations omitted.)). "Under this framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation." *Barker*, 513 F.3d at 834 (citing *Clark v. Johanns*, 460 F.3d 1064, 1067 (8th Cir. 2006)). To establish a prima facie case of retaliation, the plaintiff must prove "(1) [she] engaged in a protected activity; (2) an adverse employment action was taken against [her]; and (3) a causal connection exists between the two." *Id.* (citing *Thompson v. Bi-State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006)). The plaintiff's burden at the prima facie case stage of the analysis is not onerous, and "[a] minimal evidentiary showing will satisfy this burden of production." *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005) (quoting *Pope v. ESA Serv., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005)). "Once the plaintiff satisfies this burden, [the] defendant must offer a legitimate, non-discriminatory reason for the employment action." *Barker*, 513 F.3d at 834. "The burden of production then returns to the plaintiff to show that the employer's reason was a pretext for discrimination." *Id.*

"The ultimate burden of proof or persuasion to show that the employer's conduct

was motivated by retaliatory intent remains at all times on the plaintiff." *Wallace v. DTG Opers., Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). "The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent." *Id.* To establish a retaliation claim, a plaintiff need not succeed on an underlying harassment claim. *Gilooly v. Mo. Dept. of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005) (citing *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)). "A plaintiff need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct violated the law." *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000).

### C. Standard for Summary Judgment

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). Once the moving party has

successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see, e.g., Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## IV. THE MERITS OF THE CLAIMS OF THE PLAINTIFFS-INTERVENERS

CRST asks the court to dismiss the claims of Mss. Boot, Cinquemano, Grant, Peeples, Starke and Thomas. (CRST does not ask the court to dismiss Ms. Moffett's claims.) The court considers CRST's arguments with respect to each these six women, in turn.

### A. Ms. Boot

#### 1. Facts

Ms. Janet Boot f/k/a Mrs. Janet Nibeck-Peck resides in Iowa City, Iowa. She worked as a truck driver for CRST from April of 1997 to January of 1998. Ms. Boot has spina bifida and uses a urine collection system bag. The urine bag gets dirty and is not easy to remove.

Ms. Boot alleges one of her trainers, Mr. Gerald Holmes, sexually harassed her in May or June of 1997 while they were driving a CRST semi-truck in Nevada. According to Ms. Boot:

> I opened up the curtains one night to tell him that I had to go
> to the rest room, and I did not see his penis, but his hand was
> going up and down and there was white sperm that got all over

> the steering wheel. It was due to be my term to drive, but I
> wasn't going to drive, not with that all over the steering wheel.

Def.'s App'x at 464. Ms. Boot claims she "froze . . . just a few seconds," "closed the curtain" and returned to her bunk in the back of the semi-truck's cab. *Id.* This masturbation incident shocked Ms. Boot and caused her to start shaking.

When Ms. Boot and Mr. Holmes arrived at a fuel stop about two hours down the road from the masturbation incident, Ms. Boot called her dispatcher. Ms. Boot told her dispatcher: "I [can]not be on that truck anymore and I [am] getting off of it." *Id.* at 465. Ms. Boot did not tell her dispatcher or any other members of CRST management about the masturbation incident. Ms. Boot's dispatcher nonetheless honored Ms. Boot's request to leave the semi-truck, reserved a hotel room for Ms. Boot for the night and assigned Ms. Boot a new trainer in less than twenty-four hours. Ms. Boot later successfully completed her training with a different driver, and CRST eventually promoted her to co-driver status.

On January 16, 1998, CRST randomly tested Ms. Boot for narcotic drugs. Ms. Boot told CRST that she needed to take the test at the University of Iowa with a clean urine bag. CRST denied her request, and Ms. Boot tested positive for THC.[8] Ms. Boot later took a second test with a clean urine bag and tested negative for controlled substances.

On July 8, 1998, CRST terminated Ms. Boot's employment because she failed the first drug test. On September 11, 1998, Ms. Boot filed a charge of discrimination with the EEOC and the Wisconsin Equal Rights Division. On November 23, 1998, the EEOC issued Ms. Boot a right-to-sue letter. However, it does not appear Ms. Boot filed a Title VII or state civil rights lawsuit against CRST.

On January 21, 2000, Ms. Boot filed a lawsuit against CRST and others in the Iowa

---

[8] THC, or tetrahydrocannabinols, is a Schedule I controlled substance and tends to show Ms. Boot smoked marijuana. *See United States v. White Plume*, 447 F.3d 1067, 1070 (8th Cir. 2006) (discussing 21 U.S.C. § 841 *et seq.*).

District Court in and for Linn County. She pressed several common law claims, including negligence, defamation and breach of fiduciary duty.

On December 14, 2001, Ms. Boot and CRST entered into a confidential settlement agreement. In exchange for $3,000, Ms. Boot agreed to dismiss her lawsuit and release CRST from "any and all other existing or potential claims between them involving her employment with CRST," *id.* at 3414, including but not limited to claims under Title VII and ICRA. On January 22, 2002, Ms. Boot dismissed her lawsuit.

### 2.    Argument

CRST offers six independent reasons why the court should dismiss Ms. Boot from this lawsuit with prejudice. CRST points out that (1) Ms. Boot's Title VII claims are untimely, because she alleges she was sexually harassed in 1997; (2) Ms. Boot's ICRA claims are untimely, because she never filed a charge of discrimination with the ICRC; (3) all of Ms. Boot's claims are barred under the express terms of the 2001 settlement agreement; (4) Ms. Boot did not suffer severe or pervasive sexual harassment, because the masturbation incident, while vulgar, was not directed at her or at her gender; (5) Ms. Boot never reported sexual harassment to anyone at CRST; and (6) there is no basis for any retaliation claim, because CRST fired Ms. Boot for failing a random drug test eight months after the alleged sexual harassment occurred.

Ms. Boot concedes her "individual federal and state claims are not timely and that the [s]ettlement [a]greement with CRST precludes her individual claims as well." Resistance (docket no. 161), at 28. She also concedes she "does not have a retaliation claim as such a claim is both untimely and covered by [the parties' settlement agreement.]" *Id.* at 42. Instead, Ms. Boot proffers a largely incoherent argument as to why the court should not dismiss her from this lawsuit. Without citing any legal authority, Ms. Boot contends she is "not precluded from receiving monetary relief as a class member being part of the EEOC's pattern and practice claim because CRST maintained a companywide

pattern or practice of sexual discrimination that dated back to when [Ms. Boot] was retaliated against, and because the EEOC is not bound by the Settlement Agreement and Release." *Id.* at 28.

### 3. Analysis

Ms. Boot's claims are frivolous. As Ms. Boot concedes in her Resistance, her Title VII and ICRA claims are untimely or unexhausted and, in any event, barred under the terms of the settlement agreement. Even if the court were to assume that the settlement agreement does not estop the EEOC from seeking monetary relief on Ms. Boot's behalf in this action, the EEOC did not resist the Motion. In any event, the court has already held in prior orders that (1) CRST did not engage in a pattern or practice of sexual harassment, *see* Order (docket no. 197), *passim*, and (2) the EEOC is not immune from § 2000e-5's statute of limitations and thus may not seek relief for sexual harassment alleged to have occurred prior to February 4, 2005, *i.e.*, more than 300 days prior to the filing of Ms. Starke's Charge on December 1, 2005, *see* Order (docket no. 223), *passim*. And even if these prior procedural rulings did not completely undercut Ms. Boot's argument, her sexual harassment claims would still fail on their merits. There is no evidence that Ms. Boot reported the masturbation incident to CRST before she was fired. *See, e.g., Anda v. Wickes Furn. Co.*, 517 F.3d 526, 533-34 (8th Cir. 2008) (dismissing hostile work environment sexual harassment claim on a number of alternative bases, in part because "the record is void of any evidence that Anda reported the alleged incidents of sexual harassment . . . before she resigned"). Because Mr. Holmes was Ms. Boot's coworker and not her supervisor, *see* Order (docket no. 197), at 60-61,[9] at trial she would

---

[9] "'The burden of proof to show that [the harasser] was the plaintiff's supervisor lies with the plaintiff.'" *Sicalieds v. Pathmark Stores, Inc.*, No. Civ. A. 99-CV-3465, 2000 WL 760439, *7 n.6 (E.D. Pa. Jun. 12, 2000) (quoting *Kent v. Henderson*, 77 F. Supp. 2d 628, 633 (E.D. Pa. 1999)). Other courts have uniformly held that truck driver trainers are coworkers and not supervisors. *See, e.g., Huffman v. New Prime, Inc.*, No.

be required to prove that CRST "'knew or should have known of the conduct and failed to take proper remedial action.'" *Joens*, 354 F.3d at 940 (quoting *Dhyne*, 184 F.3d at 987). She has failed to generate a genuine issue of material fact on this element of her sex discrimination claims. Ms. Boot's retaliation claims fail on their merits, because CRST clearly fired her for her positive drug test; there is no other reasonable explanation for CRST's adverse employment action. Simply put, a reasonable jury could not find pretext here.

Accordingly, the court shall dismiss Ms. Boot from this lawsuit with prejudice.

### B. Ms. Cinquemano

#### 1. Facts

Ms. Nicole Cinquemano worked for CRST as a contract driver from December of 2007 to April of 2008. Prior to her employment, CRST paid Ms. Cinquemano's tuition to the "Show Me the Road Truck Driving School" in Sikeston, Missouri. Def. App'x at 692. In exchange, Ms. Cinquemano promised to work for CRST for at least eight months.

At the outset of her employment with CRST, Ms. Cinquemano attended orientation in Cedar Rapids, Iowa. The orientation included anti-sexual harassment training. Ms. Cinquemano read CRST's anti-sexual harassment policy and understood she should contact her fleet manager immediately in the event she was sexually harassed. She also signed a written pledge to follow the policy.

---

01-CV-S-0DS-ECF, 2003 WL 24009006, *5 (W.D. Mo. Dec. 17, 2003) (adhering to prior ruling that "truck driver trainers were co-workers rather than supervisors"); *Vernarsky v. Covenant Transp., Inc.*, No. 1:01-CV-305, 2003 WL 21212776, *5 (E.D. Tenn. Apr. 15, 2003) (holding trainers of new truck drivers were not supervisors for purposes of Title VII); *see also Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 850-51 (8th Cir. 2005) (holding foreman was not supervisor for purposes of Title VII because it was undisputed the foreman could not hire, fire, promote or reassign the plaintiff; it was irrelevant that the plaintiff's supervisor may have consulted with the foreman on such matters and the plaintiff may have believed the foreman was her supervisor).

During her orientation, Ms. Cinquemano informed a member of CRST's Safety Department that someone had sexually abused her for three years when she was a child. Ms. Cinquemano told the member of the Safety Department that she had concerns about training under anyone other than her husband, Mr. Michael Cinquemano. (Mr. Cinquemano was one of CRST's fully trained co-drivers.). The member of the Safety Department told Ms. Cinquemano he would try to pair her with her husband.

At the conclusion of her orientation, however, CRST declined to allow Ms. Cinquemano to train under Mr. Cinquemano. Mr. Cinquemano had a poor driving record; he had "got[ten] stuck in the mud twice." Pl.'s App'x at 15. Ms. Cinquemano was agitated that CRST did not assign her to train under her husband, because the opportunity to work with her husband was "the reason why [she] actually joined CRST." Def.'s App'x at 669.

One of CRST's managers asked Ms. Cinquemano if there was anyone else with whom she would be comfortable driving. Ms. Cinquemano suggested Mr. Randy Moore, Mr. Cinquemano's former trainer. The two men had known each other for almost three years and had gotten along well.

Mr. Cinquemano approached Mr. Moore "man to man" and asked him to train his wife. Pl.'s App. at 15. Mr. Cinquemano told Mr. Moore about Ms. Cinquemano's history of sexual abuse and asked Mr. Moore to take special care of Ms. Cinquemano. Mr. Moore swore to Mr. Cinquemano that he would take good care of his wife.

CRST assigned Mr. Moore to train Ms. Cinquemano, but Mr. Moore betrayed the Cinquemanos' trust. Ms. Cinquemano trained under Mr. Moore from December 16 through 19, 2007. They drove from Cedar Rapids to Salt Lake City, Utah, and then to Carlisle, Pennsylvania. At one point, Mr. Moore told Ms. Cinquemano: "Here comes another truck. Lift up your shirt and then show him your . . . boobs." Def.'s App'x at 663. Ms. Cinquemano refused. While they were driving in Ohio on the way from Utah

to Pennsylvania, Mr. Moore asked Mr. Cinquemano to "go down on him . . . while [he] was driving." *Id.* at 663-64. Mr. Moore also "peeped on" Ms. Cinquemano and touched her inappropriately. Pl.'s App'x. at 145.[10] While they drove together, Mr. Moore was constantly on his cell phone "talking . . . dirty stuff." Def.'s App'x at 664.

Mr. Moore tried to intimidate Ms. Cinquemano into keeping silent about his conduct. Mr. Moore told Ms. Cinquemano that he had a military background and "was trained on how to kill people." Pl.'s App'x at 33. Mr. Moore told Ms. Cinquemano that, if she reported him to CRST, he would know "how to get [her] back," *id.*, and her "training license would be gone," *id.* at 145. Further, Mr. Moore said "he knew where to find [her], and by turning him in [Ms. Cinquemano] would be taking food out of his kid's mouth." *Id.* Against CRST regulations, Mr. Moore kept a knife on their semi-truck.

Mr. Moore also became verbally abusive toward Ms. Cinquemano. While descending "the Rocky Mountain [sic]" en route to Utah from Iowa, Ms. Cinquemano

---

[10] In her charge of discrimination, filed four months before her deposition, Ms. Cinquemano swore that Mr. Moore peeped on her and touched her inappropriately. Ms. Cinquemano did not mention any peeping and touching in her subsequent deposition, however; to the contrary, Ms. Cinquemano repeatedly testified that the sexual harassment was limited to Mr. Moore's requests for her to expose her breasts and perform fellatio. Without citing any legal authority and notwithstanding its failure to cross-examine Ms. Cinquemano as to this discrepancy, CRST argues Ms. Cinquemano's charge is inadmissible in light of her subsequent deposition testimony. The court assumes without deciding that Ms. Cinquemano's statements in her charge are admissible. *Compare Tippens v. Celotex Corp.*, 805 F.2d 949, 954 n.6 (11th Cir. 1986) (avoiding issue of whether to extend the sham affidavit rule to affidavits filed before depositions but remarking that "it is much less likely that an affidavit which precedes a weak deposition is filed as a transparent sham") *and Couden v. Duffey*, 533 F. Supp. 2d 490, 505 (D. Del. 2008) (declining to invoke sham affidavit doctrine where affidavit preceded deposition when the defendant failed to cross-examine the deponent about contradictions), *with In re CitX Corp., Inc.*, 448 F.3d 672, 680 (3d Cir. 2006) (affirming district court's decision to exclude prior filed affidavit at summary judgement stage, because there is "no principle that cabins sham affidavits to a particular sequence") *and Tippens v. Celotex Corp.*, 815 F.2d 66, 68-69 & n.2 (Hill, J., dissenting from denial of reh'g en banc) (similar).

began "yelling" for Mr. Moore to come out of his bunk. Def.'s App'x at 680. The semi-truck's brakes were failing, and she was speeding out of control. Ms. Cinquemano begged Mr. Moore to help her. Mr. Moore responded: "Just drive the fuckin' truck. You know how to drive a fuckin' truck. Just drive it. Why can't I get some damn fuckin' sleep around here." *Id.* at 680-81.

Ms. Cinquemano did not complain about Mr. Moore's conduct to CRST while the two were driving together. She did not get off the truck on account of any sexual harassment. Rather, on December 19, 2007, Mr. Moore dropped Ms. Cinquemano off at the Rodeway Inn in Carlisle, Pennsylvania as previously scheduled.[11] On December 22, 2007, Ms. Cinquemano's husband joined her in Carlisle and stayed about a week at the Rodeway Inn.

Mr. Cinquemano persuaded his wife to complain to CRST about the sexual harassment. On December 27, 2007, Ms. Cinquemano made a report of sexual harassment to CRST's Human Resources Department. A member of the Human Resources Department asked Ms. Cinquemano to provide a detailed account of the sexual harassment. On January 2, 2008, Ms. Cinquemano sent a facsimile detailing the harassment to CRST from the Rodeway Inn.

CRST later interviewed Mr. Moore about Ms. Cinquemano's allegations. Mr. Moore suggested that Ms. Cinquemano fabricated her allegations because the Cinquemanos owed him $600 and wanted to avoid repaying their debts to him. He denied swearing at her. Despite Ms. Cinquemano's repeated attempts, CRST broke its promises and never got back to Ms. Cinquemano about the status of its investigation.

Ms. Cinqemano resumed training with CRST in mid-January of 2008. Ms.

---

[11] Mr. Moore had decided to spend some time at his home. He went out of his way to drop Ms. Cinquemano off in Carlisle so she might avoid having to take a bus from some other location to Carlisle.

Cinquemano completed her training with with Mr. Jerry Cummings. Her training with Mr. Cummings was "[f]antastic" and lasted through January of 2008. *Id.* at 672. She began driving with her husband in February of 2008.

All was not well, however, during this time frame. Immediately after she reported her claim of sexual harassment, CRST lowered Ms. Cinquemano's mileage to a "[v]ery low" level. *Id.* at 676. And on February 29, 2008, Cinquemano slipped and injured herself while exiting her truck. The Cinquemanos stayed together in Cedar Rapids for the month March as she recuperated from her injuries, received treatment and performed light duty work in Cedar Rapids.

When Ms. Cinquemano resumed driving with her husband, her dispatcher ordered her to unload a fifty-foot long trailer full of evergreen trees all by herself. The evergreen trees were all taller than Mr. Cinquemano, who is 6' 4" tall. The dispatcher specifically instructed Mr. Cinquemano not to help his wife. It took Ms. Cinquemano a long time to unload all of the trees, and CRST later faulted Ms. Cinquemano for the delay. Ms. Cinquemano complained about her dispatcher to one of CRST's managers, Mr. Jim Chapman. Mr. Chapman told Ms. Cinquemano he would see if he could transfer her to another dispatcher.

Soon thereafter, on April 15, 2008, CRST fired Ms. Cinquemano. Mr. Chapman explained to Ms. Cinquemano that it was a business decision and not a performance issue. CRST's business was slowing, and there was little freight moving in its system.

In the instant litigation, CRST now cites poor performance as one of the reasons why it fired Ms. Cinquemano. Ms. Cinquemano admits her miles were very low, but believes CRST is using her miles as an excuse to hide its desire to punish her for complaining about sexual harassment.

### 2. Arguments

CRST argues Ms. Cinquemano's sexual harassment claims under Title VII and

ICRA fail for two independent reasons: (1) she did not suffer severe and pervasive sexual harassment and (2) she failed to report any sexual harassment to CRST in a timely manner. CRST also claims Ms. Cinquemano "has no basis whatsoever for a retaliation claim." Brief in Support of Motion (docket no. 145-2), at 11. CRST argues there is "no evidence" in the record to show a causal connection between Ms. Cinquemano's complaint of sexual harassment against Moore and her firing. Reply (docket no. 181), at 16. CRST points out she was terminated months after making her sexual harassment complaint. CRST maintains it fired Ms. Cinquemano because of slow business and poor performance.

Ms. Cinquemano resists the Motion in its entirety. Ms. Cinquemano argues she was subjected to severe and pervasive sexual harassment. She states: "[I]t must be remembered that [she] worked in an environment in which woman [sic] are routinely subject to indecent exposure, masturbation, unwanted propositions, pornography and sexual assaults" and that she "lived, worked and slept with her harasser in a small secluded space virtually twenty-four hours a day." Resistance (docket no. 161), at 33. Ms. Cinquemano does not specifically address CRST's argument that she failed to report her sexual harassment in a timely manner. In other words, Ms. Cinquemano appears to concede that, if Mr. Moore was not her supervisor, CRST may not be held strictly liable for his conduct. Ms. Cinquemano states a reasonable jury could find that she was fired for making a complaint of sexual harassment as opposed to slow business or, as CRST now alleges, poor performance. Not only do CRST's shifting explanations for her firing give rise to an inference of retaliation, but a reasonable jury could find the reduction in miles on the heels of her complaint is damning.

### 3. Analysis

#### a. Sexual harassment claims

The court holds Ms. Cinquemano failed to present sufficient evidence to prove her sexual harassment claims. The court assumes without deciding that Ms. Cinquemano

suffered severe and pervasive sexual harassment. Because Mr. Moore was Ms. Cinquemano's coworker and not her supervisor, Order (docket no. 197), at 60-61, she is required to prove that CRST "'knew or should have known of the conduct and failed to take proper remedial action.'" *Joens*, 354 F.3d at 940. She has failed to generate a genuine issue of material fact on this element of her sexual harassment claims. CRST did not know about Mr. Moore's conduct until after it ended. By failing to report Mr. Moore's actions promptly, Ms. Cinquemano did not provide CRST with an opportunity to take proper remedial action. *Cf. Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 851 (8th Cir. 2005) (affirming dismissal of retaliation claim, where the plaintiff "did not report any harassment occurring after . . . [her supervisor] was first alerted that it was in fact [the plaintiff] who was being harassed").

Accordingly, the court shall dismiss Ms. Cinquemano's Title VII and ICRA sexual harassment claims.

### b.    *Retaliation claims*

The court holds Ms. Cinquemano has presented sufficient evidence to survive summary judgment as to her retaliation claims. There is sufficient evidence of a causal connection between Ms. Cinquemano's protected activity in January of 2008 and her termination in April of 2008.

> Although the temporal proximity between the protected activity and the alleged retaliatory act must generally be 'very close,' the 'employee may attempt to shorten the gap between [the] protected activity and the adverse action by showing that shortly after [the employee] engaged in the protected activity, the employer took escalating adverse and retaliatory action against [the employee].'

*Heaton v. Weitz Co.*, 534 F.3d 882, 888 (8th Cir. 2008) (quoting *Hite*, 446 F.3d at 866). Here, the approximately four month gap between the protected activity and the adverse employment action weighs against an inference of retaliation. *See Hesse*, 394 F.3d at 633

("A gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive."); *see also Heaton*, 534 F.3d at 888 (intimating that a six month gap in time weighted against an inference of retaliatory motive or was, at the very least, insufficient in itself to establish causation). At the very least, the gap is—in itself—insufficient evidence of retaliation to survive summary judgement. *See Clark County*, 532 U.S. at 273-74 (citing cases holding that three-month and four-month intervals between the protected activity and the adverse employment action were insufficient to establish the requisite causal nexus) (citations omitted); *Kipp*, 280 F.3d at 897 (determining that a two-month interval was, by itself, insufficient to establish a causal nexus). However, as in *Heaton*, "all was not well during this . . . period." 534 F.3d at 888. Immediately following her complaint of sexual harassment, CRST reduced Ms. Cinquemano's hours. One of her dispatchers made her perform the difficult, if not impossible, task of unloading a fifty-foot long trailer full of evergreen trees by herself; CRST later faulted Ms. Cinquemano for failing to unload the evergreen trees in a timely manner. Finally, CRST has offered shifting reasons for her termination over time. *See, e.g., EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) ("[S]hifting reasons support a finding of illegal motivation."); *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1023 (8th Cir. 1998) (shifting reasons for termination tend to show preferred reason was pretext for discrimination). Notably, CRST did not present the court with any evidence to document its allegation that Ms. Cinquemano was a poor performer.

In sum, a reasonable jury could find freight was slow and Ms. Cinquemano was a poor performer or a reasonably jury could find CRST fired Ms. Cinquemano because she made a sexual harassment complaint. Under such circumstances, summary judgment is not appropriate. Accordingly, the court shall not dismiss Ms. Cinquemano's Title VII and ICRA retaliation claims.

### C. Ms. Grant

Ms. Barbara Grant, a resident of South Carolina, worked as a contract driver for CRST from June to September of 2007. She alleges that one of her trainers, Mr. Jackson Hamp, sexually harassed her from June 17, 2007 to June 27, 2007.

With respect to Ms. Grant's sexual harassment claims, CRST does not dispute that Mr. Hamp subjected Ms. Grant to severe and pervasive sexual harassment. Rather, CRST contends Ms. Grant never reported the sexual harassment to her dispatcher. Although Ms. Grant's deposition testimony is not a model of clarity, the court finds that a reasonable jury could find that Ms. Grant repeatedly complained about Mr. Hamp's severe and pervasive conduct to her dispatcher and her dispatcher ignored her. *See, e.g.*, Def.'s App'x at 1193 ("I picked up the phone and called Lisa, [who] was my fleet manager, and I told her what was going on . . . ."); Pl.'s App'x at 54 ("Like I said, at some point I had to tell Lisa. I don't know what day it was, but she knew what was happening, and she never done [sic] anything about it until the day that he started to pull me off in New Mexico . . . . There is no way I could have taken a whole week with [Mr. Hamp] and not told dispatch at some point what was going on.").

With respect to Ms. Grant's retaliation claims, CRST argues that there is insufficient evidence to establish a causal connection between Ms. Grant's alleged complaints about Mr. Hamp to CRST and any adverse employment action. The court agrees. The circumstances surrounding Ms. Grant's departure from CRST are wholly unclear from the record; it is unclear whether Ms. Grant abandoned her position or CRST terminated Ms. Grant for abandoning her truck after she refused to drive with her final team driver, Mr. William Hawthorne. Even if the court assumes CRST fired Ms. Grant, there was a two-and-one-half month gap between her last complaint of sexual harassment and her termination. Standing alone, this gap in time is too great to establish a causal connection between any protected activity and CRST's adverse employment action. *Kipp*, 280 F.3d at 897. Further, there is no evidence CRST took escalating adverse and

retaliatory action against Ms. Grant during the two-and-one-half month period. *Cf. Heaton*, 534 F.3d at 888. Nor has CRST offered shifting reasons for Ms. Grant's termination. *Cf. Wal-Mart Stores*, 477 F.3d at 571.

Accordingly, the court shall not dismiss Ms. Grant's Title VII and ICRA sexual harassment claims. The court shall dismiss Ms. Grant's Title VII and ICRA retaliation claims.

### D. Ms. Peeples

#### 1. Facts

Ms. Remcey Jeunenne Peeples a/k/a Jeunenne Peeples a/k/a Jeunenne Lassiter a/k/a Jeunenne Wyatt a/k/a Jeunenne Chaney, a life-long resident of Texas, worked for CRST as a contract driver from August 4, 2005 to September 20, 2005. She alleges her second trainer, Mr. Robert Stanley, sexually harassed her over a three-day period from August 15, 2005 to August 18, 2005. Among other things, Mr. Stanley told Ms. Peeples "he wanted to Velcro [her] hands and [her] feet together," Pl.'s App'x at 67, engaged in unwanted touching of Ms. Peeples' person, told her she "need[ed] to have sex" with him, Def.'s Ex. at 2136, "pointed at his penis and said, 'Don't you want some of this?,'" *id.*, touched her leg, jumped on her bunk while she was in it, made other sexually charged comments and repeatedly propositioned her for sex. He told her his marriage was failing and she "could become his new woman." *Id.* at 2169. The comments escalated over time. At one point, Mr. Stanley told Mr. Peeples: "You know you're going to have to have sex with me to pass this training course." *Id.* at 2137.

Tired and fed up with the sexual harassment, Ms. Peeples left Mr. Stanley's truck at a fuel stop in Arizona on August 18, 2008, at 1:30 a.m. She also called the police and one of CRST's managers. She told the manager about the sexual harassment.

The manager refused to help Ms. Peeples. Fortunately, a CRST driver who happened to be at the fuel stop offered to drive Ms. Peeples to CRST's nearest terminal

in California.  The manager agreed to let Ms. Peeples ride with the driver to California, where she might find another trainer.

One of CRST's managers eventually referred Ms. Peeples to CRST's Human Resources Department.  Ms. Peeples talked about her sexual harassment with human resources personnel and faxed a complaint.  Ms. Peeples' fax contained many obvious errors; numerous dates were clearly incorrect.  CRST's Human Resources Department accused Ms. Peeples of lying about the sexual harassment.  Around the same time, Ms. Peeples requested a specific new trainer.  CRST agreed and assigned Ms. Peeples and her new trainer a load within a few days.

While waiting in California for the load, Ms. Peeples went to a doctor for vaginal bleeding.  The doctor diagnosed the bleeding as menopause.  Ms. Peeples drove for CRST for approximately one more month.[12]  Her vaginal bleeding persisted.  On September 20, 2005, Ms. Peeples went to a doctor in Texas for a second opinion.  The doctor diagnosed Ms. Peeples with cervical cancer.  He ordered her to stop driving for CRST lest she risk bleeding to death from all of the truck's vibrations.

Ms. Peeples subsequently underwent radiation and chemotherapy to treat her cervical cancer.  Due to the treatments, she has been continuously unable to return to work despite her desire to do so.

### 2. *Analysis*

Ms. Peeples's Title VII and ICRA sexual harassment claims fail as a matter of law. Assuming without deciding that Ms. Peeples suffered severe and pervasive sexual

---

[12] At some point in time, Ms. Peeples jack-knifed her truck and, on another occasion, ran her truck into a ditch.  She received a failing grade for her lack of skill in driving the truck.

harassment at the hands of Mr. Stanley,[13] the court must dismiss her sexual harassment claims because she did not report the sexual harassment to CRST in a timely manner. It is undisputed that CRST did not know of Mr. Stanley's conduct towards Ms. Peeples until after it ended; she did not make a complaint of sexual harassment until after she stopped driving with him. By failing to report Mr. Stanley's actions in a timely manner, Ms. Peeples did not provide CRST with an opportunity to take proper remedial action. *Cf. Cheshewalla*, 415 F.3d 847 at 851.

Ms. Peeples's Title VII and ICRA retaliation claims also fail as a matter of law. A reasonable jury could not find a causal connection between Ms. Peeples's complaint about Mr. Stanley's conduct and any adverse employment action. CRST fired Ms. Peeples because she was diagnosed with cervical cancer, not because she made a complaint of sexual harassment. While CRST fired Ms. Peeples only a month or so after she complained about sexual harassment, it is undisputed that CRST found her a new trainer and a load and continued to employ her without incident until she informed CRST she was physically unable to drive a truck. Indeed, it is undisputed that Ms. Peeples' was physically unable to drive a semi-truck due to her cervical cancer and subsequent chemotherapy and radiation. Ms. Peeples offers only speculation in support of her retaliation claim, and speculation is insufficient to withstand summary judgment. *Reasonover*, 447 F.3d at 578.

Accordingly, the court shall dismiss Ms. Peeples from this case with prejudice.

### E. Ms. Starke

On May 13, 2009, the court dismissed Ms. Starke from this lawsuit with prejudice. Accordingly, the court need not reach CRST's arguments in the Motion for dismissal of

---

[13] Once again, the court may assume without deciding that certain sworn allegations in a charge of discrimination that contradict subsequent deposition testimony are admissible.

Ms. Starke's sexual harassment and retaliation claims. Accordingly, the court shall deny this portion of the Motion.

### F. Ms. Thomas

#### 1. Facts

Ms. Latesha Thomas, a resident of Florida, worked for CRST from November 13, 2006, to December 14, 2006. She drove with two trainers, Messrs. Brian Taft and Donald Brown. Mr. Taft did not sexually harass Ms. Thomas.

Ms. Thomas trained under Mr. Brown from late November of 2006 to mid-December of 2006. Her experience was "hell." Def.'s App'x at 3095. As soon as Ms. Thomas boarded Mr. Brown's truck, Mr. Brown informed Ms. Thomas that they would have to sleep in the same bunk because the top bunk was broken. When Ms. Thomas threatened to call their dispatcher, Mr. Brown suddenly found a way to fix the top bunk.

Mr. Brown made sexual comments to Ms. Thomas. For example, when Ms. Thomas left the truck he would say: "[W]ould you like some fries with that shake[?]" Def.'s App'x at 3095. Mr. Brown also propositioned Ms. Thomas for sex. Mr. Brown, who is African-American, would hold his crotch and "say[] that he haven't [sic] been with a black woman in so many years, he wanted to know how it would feel to be with a black woman, . . . he wouldn't mind sleeping with [her] . . . ." *Id.* at 3095-96.

On their third day of driving together, Mr. Brown began sleeping in the truck in the nude. Mr. Brown repeatedly told Ms. Thomas he was nude, and she could see him taking off his clothes. On one occasion, Mr. Brown put his hand on Ms. Thomas's bed and told her he wanted to have sex with her. He also tried to touch her in an inappropriate way.

Ms. Thomas called her dispatcher and told her about all of Mr. Brown's antics. The dispatcher told Ms. Thomas that CRST "would get with [Mr.] Brown and see what's going on." *Id.* at 3097.

The harassment continued unabated. Mr. Brown rubbed Ms. Thomas's leg and told

her he would take care of her financially and sexually. Mr. Brown continued to tell Ms. Thomas that he wanted to have sex with her and that he "he wanted to make sure [she] was satisfied because [she] hadn't been with a man . . . ." *Id.* at 3101.

> After he would argue with his girlfriend, he would say he needs to get his nut off, and when I was ready for him, he's down in the bunk, let him know when I'm ready for him. He would grab. . . between his legs and told me he was ready. It even happened in Georgia when the truck was broke down . . . during that time frame he [said:] "Well, we could have sex to pass time by till someone comes and put gas in the truck . . . ."

*Id.* at 3098. Mr. Brown also offered Ms. Thomas $800 to have sex with him. "He said that since I won't give it to him freely he'd offer me $800 because he kn[e]w I need[ed] the money[.]" *Id.* at 3101.

Mr. Brown became angry after Ms. Thomas repeatedly refused his sexual advances. He yelled and swore at her. He criticized her driving performance and, on one occasion, left her in the truck alone on a cold and wet night without any heat.

Ms. Thomas contacted her dispatcher a second time and told the dispatcher about Mr. Brown's continuing sexual harassment. She told her dispatcher she did not appreciate Mr. Brown's sexual advances. Again, the dispatcher ignored her complaints. He only wanted to ensure timely delivery of freight. Nothing changed.

Ms. Thomas pleaded with Mr. Brown to leave her alone. Ms. Thomas told Mr. Brown she could not endure the sexual harassment and, as a consequence, refused to drive his truck. Mr. Brown told Ms. Thomas to "get the hell off my damn truck, and I'll put your ass out." *Id.* at 3102. The truck was in the middle of nowhere in Georgia, several hours from Ms. Thomas's home in Florida. Ms. Thomas got off the truck and never drove for CRST again.

## 2. *Analysis*

CRST argues that Ms. Thomas did not suffer severe and pervasive sexual harassment and, in any event, she failed to report any sexual harassment to CRST. CRST's arguments are not well taken. From the foregoing facts, a reasonable jury could find Thomas suffered severe and pervasive sexual harassment. Mr. Brown's sexually charged actions were frequent, severe, humiliating and unreasonably interfered with Ms. Thomas's work performance. *See Clark County*, 532 U.S. 268 at 270-71 (requiring the court to consider the totality of the circumstances). This is not a case of "simple teasing, offhand comments, and isolated incidents." *Faragher*, 524 U.S. at 788. Further, a reasonable jury could find that CRST management knew about the sexual harassment and did nothing to stop it. Although Ms. Thomas's deposition testimony is not a model of clarity, when read in the light most favorable to her, a reasonable jury could find she informed CRST about Mr. Brown's actions in a timely manner. Summary judgment is, therefore, inappropriate. *See, e.g., Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008) (reversing grant of summary judgment to employer for coworker harassment "[a]lthough the affidavits do not provide specific dates")

Ms. Thomas concedes she does not have viable retaliation claims under Title VII or ICRA against CRST. Ms. Thomas asserts she wishes to pursue "constructive discharge claims" under Title VII and ICRA in lieu of the retaliation claims she pled. "An employee is constructively discharged when he or she involuntarily resigns to escape intolerable and illegal employment requirements." *Barrett v. Omaha Nat'l Bank*, 726 F.2d 424, 428 (8th Cir. 1984). However, "'[a]n employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged.'" *Tenkku v. Normandy Bank*, 348 F.3d 737, 742 (8th Cir. 2003) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995)). The court expresses no view as to the merits of Ms. Thomas's proposed constructive discharge claims in the absence of complete briefing.

It is unclear whether Ms. Thomas's proposed constructive discharge claims are properly before the court.

Accordingly, the court declines to dismiss Ms. Thomas's Title VII and ICRA sexual harassment claims. The court dismisses Ms. Thomas's Title VII and ICRA retaliation claims with prejudice.

## V. NON-EXTRATERRITORIALITY OF ICRA

### A. Arguments

In the alternative, CRST argues the court must dismiss all of the ICRA claims of Mss. Grant and Thomas[14] because they are not residents of Iowa and their claims arose outside of Iowa. In other words, CRST argues ICRA does not apply extraterritorially. CRST points out that neither Ms. Grant nor Ms. Thomas alleges she was sexually harassed within the borders of the State of Iowa; indeed, there is no evidence either woman drove through Iowa. Ms. Grant, a resident of South Carolina, alleges she was sexually harassed in Alabama, Arizona and New Mexico. Ms. Thomas, a resident of Florida, alleges she was sexually harassed in Illinois, Georgia and Oklahoma. CRST maintains the court must construe ICRA to apply only to conduct occurring within its own borders to avoid difficult questions of constitutional law, including "substantial constitutional questions under the Commerce Clause, Full Faith and Credit Clause, and the Due Process Clause." Reply (docket no. 181), at 22 (citing *Campbell v. Arco Marine, Inc.*, 50 Cal. Rptr. 2d 626, 631-32 (Ct. App. 1996)). CRST claims the mere fact it maintains its headquarters in Iowa is an insufficient basis for Mss. Grant and Thomas to assert ICRA claims.

Mss. Grant and Thomas argue that ICRA applies extraterritorially. They do not dispute CRST's characterizations of their residences or the states in which they were

_____

[14] CRST also makes its extraterritoriality argument with respect to Mss. Peeples and Starke. Because the court has already dismissed Mss. Peeples and Starke from this lawsuit, the court need not consider this portion of CRST's alternative argument.

sexually harassed. Rather, they point out that the statutory language of ICRA contains no apparent restriction on its extraterritorial application. Further, Mss. Grant and Thomas point out that the ICRC apparently believed it had jurisdiction over their charges when it issued their right to sue letters, and "[t]hese determinations by the [ICRC] deserve deference." Resistance (docket no. 161), at 50. Finally, Mss. Grant and Thomas query:

> It is unusual for an Iowa company to be complaining about being required to answer to an Iowa law. If Iowa was not appropriate, in what state, or states should the claims have been filed? Should [Ms. Grant] have brought her claim in South Carolina, even though there is no evidence that CRST is linked to that state? Was she required to have filed separate claims in Alabama, Arizona, and New Mexico where the harassment occurred[?] That seems incredibly inefficient and could lead to inconsistent results. Plus, what happened in one state, or a combination of states[,] may not have individually been severe or pervasive, although what happened in all states might have been. Dividing these claims up does not seem to make sense. We agree that a line had to be drawn somewhere. The line was drawn by the Iowa [General Assembly]. In fact[,] where the [General Assembly] drew the line makes sense and is in no way unfair to CRST. Isn't it easier for them to defend their claim in an Iowa Court applying Iowa law? It also should be remembered that the fact that the headquarters happen[s] to be located in Cedar Rapids is not the only connection that these cases have to Iowa. [CRST's Human Resources Department ("HR")] is located in Cedar Rapids. Numerous policies, actions, inactions and employment decisions by HR, including the retaliatory discharges, that impact these cases were made in Cedar Rapids. Some of the dispatchers, whose actions, or inactions, are a part of this lawsuit, were located in Cedar Rapids.

*Id.*

## B. Analysis

ICRA does not explicitly speak to the issue presently before the court. Nothing within the text of ICRA indicates whether the Iowa General Assembly intended for ICRA

to apply beyond the borders of the State of Iowa. Further, the Iowa Supreme Court has not yet decided whether ICRA operates extraterritorially. Whether ICRA extends beyond the borders of the State of Iowa is a matter of first impression.

At first blush, it would appear ICRA might apply extraterritorially. ICRA contains broad terms. It purports to apply to all employers, that is, "every . . . person employing employees within the state." Iowa Code § 216.2(7). ICRA defines "employee" recursively as "any person employed by an employer." *Id.* § 216.2(6). CRST has its headquarters at Cedar Rapids, Iowa and employs persons there, and Ms. Grant and Thomas worked for CRST.

Nonetheless, the court may not read ICRA in a vacuum but must construe its plain language against the backdrop of the non-extraterritoriality principle of statutory construction. It is settled that the Supreme Court of the United States and the Iowa Supreme Court each ordinarily presume that a statute does not apply extraterritorially absent an *affirmative indication* to the contrary within such statute. *See, e.g.*, *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (holding former version of Title VII did not apply extraterritorially), *superseded by statute as recognized in Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 (2006); *Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 131 (Iowa 1983) ("It is a generally recognized principle that a statute of one state has no extraterritorial effect beyond its borders."); *State Surety Co. v. Lensing*, 249 N.W.2d 608, 611 (Iowa 1977) (holding surety bond issued under Iowa Code § 322.4(7) (1971) did not protect a non-resident who purchased a car outside of the State of Iowa from an Iowa dealer); *Beach v. Youngblood*, 247 N.W. 545, 550 (Iowa 1933) (holding district court erred in ordering foreclosure of certain real property located in Minnesota).

*Lensing* is instructive and sheds light on how the Iowa Supreme Court would likely construe ICRA. In *Lensing*, the Iowa Supreme Court held a surety bond given by an Iowa-licensed automotive dealer pursuant to the provisions of Iowa Code § 322.4(7) (1971) did

not protect a non-resident buyer who purchased a car from the dealer outside the borders of the State of Iowa. 249 N.W.2d at 611. The Iowa Supreme Court reasoned:

> Unless the intention to have a statute operate beyond the limits of the state or country is clearly expressed or indicated by its language, purpose, subject matter, or history, no legislation is presumed to be intended to operate outside the territorial jurisdiction of the state or country enacting it. To the contrary, the presumption is that the statute is intended to have no extraterritorial effect, but to apply only within the territorial jurisdiction of the state or country enacting it. Thus, an extraterritorial effect is not to be given statutes by implication. Accordingly, a statute is prima facie operative only as to persons or things within the territorial jurisdiction of the lawmaking power which enacted it. These rules apply to a statute using general words, such as 'any' or 'all,' in describing the persons or acts to which the statute applies. They are also applicable where the statute would be declared invalid if given an interpretation resulting in its extraterritorial operation.

*Id.*(citing 73 Am. Jur. 2d *Statutes* § 395); *see also Arabian Am. Oil*, 499 U.S. at 248 (requiring that "the affirmative intention of the Congress [be] clearly expressed" to overcome the presumption against extraterritoriality); *Judkins v. St. Joseph's Coll. of Me.*, 482 F. Supp. 2d 60, 65 (D. Me. 2007) ("Clear and explicit language is necessary to overcome the presumption against extraterritorial application of a statute.").

In light of the foregoing, the court holds that ICRA does not apply extraterritorially notwithstanding its facially broad language. Nothing in the language, purpose, subject matter or history of ICRA clearly expresses or indicates that the Iowa General Assembly intended ICRA to operate beyond the borders of the State of Iowa. ICRA's "boilerplate language" is not a sufficiently clear expression of legislative intent to overcome the presumption against extraterritoriality. *See, e.g., Arabian Am. Oil*, 499 U.S. at 251 (holding "boilerplate language" insufficient to overcome the presumption against

extraterritoriality); *Union Underwear Co. v. Barnhart*, 50 S.W.3d 188, 191 (Ky. 2001) (holding facially broad language, including the use of "any" and "all," to be insufficient to extend the Kentucky Human Rights Act extraterritorially). When the Iowa General Assembly intends that a statute operate extraterritorially, it explicitly says so. *See, e.g.*, Iowa Code § 85.71 (2009) (expressly extending Iowa's workers' compensation statute outside of the borders of the State of Iowa). The court predicts the Iowa Supreme Court would "ma[k]e a policy decision, based on a combination of interstate comity and a desire to avoid choice-of-law difficulties, not to apply [ICRA] to employment situations that might arguably create a conflict with the laws of other states." *Ferrer v. Medastat USA, LLC*, 145 F. App'x 116, 120 (6th Cir. 2005). Conflicts are not hard to imagine, because ICRA prohibits more forms of discrimination than the civil rights laws of various other states. *See, e.g.*, Iowa Code § 216.6 (outlawing discrimination on the basis of "sexual orientation" and "gender identity"). Imposing the Iowa General Assembly's "policy choice on the employment practices of [its] sister states should be done with great prudence and caution out of respect for the sovereignty of other states, and to avoid running afoul of the Commerce Clause of the United States Constitution." *Ferrer*, 145 F. App'x at 120 (quoting *Union Underwear*, 50 S.W.3d at 193. The court's conclusion that ICRA does not apply extraterritorially is consistent with the overwhelming majority of courts to consider the extraterritoriality *vel non* of other jurisdictions' civil rights statutes. *See, e.g., Arabian Am. Oil*, 499 U.S. at 248 (holding former version of Title VII did not apply extraterritorially); *Ferrer*, 145 F. App'x at 119-20 (holding Kentucky Human Rights Act did not apply extraterritorially); *Campbell*, 50 Cal. Rptr. 2d at 627-33 (holding California's Fair Employment and Housing Act did not apply to a plaintiff working on the high seas); *Union Underwear*, 50 S.W.3d at 193 (holding Kentucky Human Rights Act did not apply extraterritorially); *Judkins*, 482 F. Supp. 2d at 65 (holding a non-resident was not entitled to Maine Human Rights Commission's longer filing period for age

discrimination suit against a Maine college, because all alleged discriminatory acts took place at the college's campus in the Carribean); *Wahlstrom v. Metro-N. Commuter R.R.*, 89 F. Supp. 2d 506, 527-28 (S.D.N.Y. 2000) (holding a plaintiff failed to state a cause of action under the New York City Human Rights Law because the  plaintiff did not allege that any cognizable harassment occurred while the train on which she worked was within New York City, even though she and the male engineer traveled together in New York City, the train company's headquarters was in New York City and the company distributed employment policies from its office there); *Arnold v. Cargill, Inc.*, NO. Civ. 012086(DWF/AJB), 2002 WL 1576141, *1-*4 (D. Minn. Jul. 15, 2002) (holding Minnesota Human Rights Act did not apply extraterritorially).

Accordingly, the court dismisses the ICRA sexual harassment claims of Mss. Grant and Thomas with prejudice, Mss. Grant and Thomas are not residents of Iowa and all of the alleged sexual harassment occurred entirely outside of Iowa.[15]

## *VI.  CONCLUSION*

The Motion (docket no. 145) is **GRANTED IN PART AND DENIED IN PART** as follows:

(1)     Ms. Janet Boot and Ms. Remcey Jeunenne Peeples are **DISMISSED** from this lawsuit **WITH PREJUDICE**.

(2)     Ms. Nicole Cinquemano's Title VII and ICRA sexual harassment claims are **DISMISSED WITH PREJUDICE**.  Ms. Cinquemano's Title VII and ICRA retaliation claims survive summary judgment.

---

[15]     The court recognizes that the dispatchers' failures to respond to the sexual harassment complaints is an element of the claims of Mss. Grant and Thomas.  However, it is unclear where these dispatchers were located at the time they ignored such complaints.  This is certainly not a case in which "every decision that gives rise to [the plaintiffs'] claim[s]" occurred in Iowa. *Union Underwear*, 50 S.W.3d at 193 n.1 (Lambert, C.J., dissenting).  The court expresses no view as to whether the extraterritoriality principle would bar the retaliation claims of Mss. Grant and Thomas.

(3)     The Title VII and ICRA retaliation claims of Ms. Barbara Grant and Ms. Latesha Thomas are **DISMISSED WITH PREJUDICE**.  The ICRA sexual harassment claims of Mss. Grant and Thomas are likewise **DISMISSED WITH PREJUDICE**.  The Title VII sexual harassment claims of Mss. Grant and Thomas survive summary judgment.

(4)     All of Ms. Cindy Moffett's claims survive to trial.

(5)     The EEOC is **BARRED** from seeking relief at trial to the same extent the Plaintiffs-Interveners are barred.

(6)     The EEOC is **ORDERED** to file an updated list of allegedly aggrieved persons for which it intends to seek relief at trial **on or before June 4, 2009, at 5 p.m.** *See* Order (docket no. 66), *passim*.

(7)     Ms. Boot, Ms. Peeples and the EEOC shall pay CRST's ordinary costs. CRST may file its request for costs **10 court days** after the disposition of the entire case.

(8)     Any application for attorneys' fees may be filed within **20 court days** after disposition of the entire case.

**IT IS SO ORDERED.**

**DATED** this 2nd day of June, 2009.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA